## CIRCUIT COURT OF FAIRFAX COUNTY

EG&G, Inc.

v.

The Cube Corp.

December 23, 2002

Case No. (Chancery) 178996

BY JUDGE R. TERRENCE NEY

This case was heard by the Court on September 11, 12, and 16, 2002.

*Facts*

EG&G Technical Services, Inc. ("EG&G") is a large company with extensive experience in providing management, scientific, technical, engineering, and logistics services to the federal government and others. Approximately 90% of its business involves government contracts. In its fifty-year plus history, EG&G has provided services to several federal agencies.

EG&G's federal contracts have included those with the National Aeronautics and Space Administration (NASA), the U.S. Navy, the Department of Defense, the Department of Justice, the Department of Energy, and the U.S. Customs Service, among others.

The Cube Corporation ("Cube"), founded in 1994, is also engaged in the business of providing management, operations, and maintenance support services to agencies of the federal government, as well as commercial customers. In 1999, Cube was classified as a small, minority-owned business. As a result of this status, Cube is eligible to bid on certain contracts that the federal government has set aside for competition by such businesses. See generally 15 U.S.C. § 631 *et seq*. (2002).

In December 1999, the National Aeronautics and Space Administration, and the U.S. Navy announced that several contracts, which were at the time being performed at the Wallops Institutional Flight Facility on Wallops Island, Virginia, were going to be combined into a single, consolidated contract. The resulting consolidated contract was to be called the Wallops Institutional Consolidated Contract ("WICC").

With respect to the WICC contract, NASA and the Navy announced their intent to issue a Request for Proposals ("RFP") for the procurement of operations and maintenance support services at NASA's flight facility on Wallops Island. The announcement described the WICC as a cost-plus incentive fee/award term contract, with an initial term of four years and the potential for an award of up to six additional years, depending on performance. The announcement also noted that the WICC procurement would be a small business set-aside. The effect of NASA's RFP's being issued on a small set-aside basis was that only businesses qualified under applicable regulations as "small businesses" could submit proposals to NASA to be the prime contractor under the WICC.

In 2000, when the initial proposals were due in response to the NASA RFP, Cube qualified as a small business eligible to compete for the prime contractor position under the WICC. Cube, however, lacked the necessary experience in certain areas that were to be included on the WICC. Areas in which Cube lacked experience included emergency services, environmental management, and telecommunications.

EG&G, on the other hand, did possess the requisite experience to provide the types of services that were required under the WICC. Although interested in participating in the WICC, EG&G as a large business was not eligible to bid on the WICC contract as a prime contractor.

Given their respective positions in terms of experience and eligibility to bid on the WICC, Cube and EG&G decided to join forces. In late 1999, in

anticipation of submitting a proposal as prime contractor in response to the NASA RFP, Cube and EG&G met to discuss the idea of teaming together to bid on the WICC. Shortly thereafter, Cube and EG&G entered into a Subcontract Agreement, known between the parties and hereafter as the "Teaming Agreement." Teaming agreements between and among different companies are commonly used in connection with federal procurements of numerous and varied types of services. In addition to its Teaming Agreement with EG&G, Cube executed teaming agreements with five other companies for the purpose of preparing its proposal for the WICC.

The Teaming Agreement expressed a two-part bargain. First, EG&G agreed to work with Cube to prepare a response to the anticipated RFP for the WICC. Specifically, the parties' intent was that Cube, as prime contractor, and EG&G, as subcontractor, would combine their expertise and resources to develop, edit, produce, and deliver a compliant proposal in response to NASA's RFP.

Second, in exchange for EG&G's efforts on the proposal, the Teaming Agreement stated, "If the contract is awarded to The Cube Corporation, EG&G will be performing certain functional areas as a subcontractor to The Cube … with the functions to be determined, once the RFP is released,"[1] and that EG&G would perform up to "49% of the contract dollar value." Because the WICC is a small business set-aside, the small business prime contractor, such as Cube here, must be responsible for at least 51% of the work. The Teaming Agreement further noted that the parties would work together "on an exclusive basis."

With respect to compensation, Exhibit 1 to the Teaming Agreement stated that Cube would "agree with EG&G Logistics at the time of proposal submission on a fully loaded fee structure,[2] to be used by both The Cube and EG&G Logistics." Exhibit 1 additionally provided that, if the WICC were awarded to Cube, the parties would "enter into a prime/subcontract agreement for the sole purpose of performing the contract requirements."

---

[1] Article 2.2 of the Teaming Agreement describes the work that EG&G would perform as subcontractor.

[2] The elements of such a fee structure include general and administrative expenses ("G&A"), overhead, and profit. The term "G&A" refers to those management, financial, and other expenses incurred by a business for the general management and administration of the business as a whole. Generally, a company's G&A rate is calculated by dividing its total allowable G&A expense pool by its total direct allowable contract costs. In the context of a government cost reimbursement contract, a contractor may recover its G&A expenses in addition to the direct costs incurred in performing a contract. Under such a contract, a contractor may elect to recover less than its actual G&A expense.

In the spring of 2000, NASA and the Navy issued a draft RFP for the WICC. The draft RFP contained a Statement of Work ("SOW") that outlined sixteen particular functions, called Work Breakdown Structures ("WBS") that the Government sought to have performed at the NASA/Navy Wallops Institutional Flight Facility on Wallops Island, Virginia. The final RFP for the WICC was issued July 10, 2000.

As envisioned by Article 2.2 of the Teaming Agreement, Cube and EG&G divided up the SOWs according to each company's abilities and areas of expertise. The parties then worked together to prepare a proposal for the WICC (the "Initial Proposal"). In preparing their proposal, Cube and EG&G hired consultants, researched existing contracts and functions being performed at Wallops Island that were to be consolidated into the WICC, and examined staff levels and rates needed to perform the functions at the WICC.

On August 28, 2000, Cube, as prime contractor, submitted the Initial Proposal[3] to the Government. The proposal incorporated summary cost data for EG&G's portion of the work. EG&G's cost data included EG&G's proposed fully-loaded labor rates (i.e., pay rates with G&A and overheard costs) for the categories that EG&G expected to furnish in performing designated functional areas, i.e. SOWs, under the WICC. In addition, both Cube and EG&G submitted detailed cost proposals directly to NASA, under seal, in order to preserve the proprietary and confidential nature of certain costs, such as the specific G&A rates that each company was applying to the WICC. EG&G and Cube, pursuant to the agreement, did not disclose to each other their respective specific G&A rates, fringe rates, or any overhead rates, which made up part of their fully loaded labor rates. This procedure for disclosing information was acknowledged in Cube's Cost Proposal volume. Cube's Cost Proposal volume recognized that EG&G, in addition to recouping its costs, was to share in the fee (profit) award that Cube proposed to earn on the WICC. As agreed by the parties, only Cube's cost proposal included a fee (profit), which if earned, would be shared by the parties. EG&G did not include in its own cost proposal any proposed fee.

NASA reviewed Cube's Initial Proposal. Subsequently, NASA conducted discussions with Cube, informing Cube of the proposal's strengths and weaknesses. At the conclusion of the discussions, NASA requested that Cube submit a Final Proposal Revision ("FPR"). Cube, with EG&G's participation and support, prepared the FPR. EG&G spent more than $70,000 in direct bid and proposal ("B&P") costs for preparing the WICC proposal. In addition,

---

[3] The Initial Proposal consisted of three volumes: a Technical Proposal (Vol. 1), a Cost Proposal (Vol. II), and a Management Proposal (Vol. III).

EG&G spent significant time and effort on the WICC proposal that is not accounted for in the B&P numbers. Cube submitted the FPR to NASA, in three volumes, on May 21, 2001.

With the exception of certain edits and additions that were made in the FPR in response to NASA's comments, the Initial Proposal and the FPR contained much of the same information. As with the Initial Proposal, EG&G gave a summary of its estimated fully-loaded costs to Cube, while providing detailed cost information directly to NASA. Cube incorporated EG&G's summary data into its overall Cost Proposal for the WICC, which included a G&A rate cap of 3.9%. As both parties would discover later, the 3.9% G&A rate cap offered by Cube was significantly less than the 8.77% rate proposed by EG&G in the FPR with respect to EG&G's *actual* costs on the WICC project. As before, Cube prepared a proposal for calculating the fee on the WICC and noted that EG&G would share in the proposed fee award. Prior to submission of the FPR, Cube and EG&G agreed that they would share any fee based on each parties' proportion of actual incurred costs compared to total contract costs. Testimony of Thomas Walter, September 11, 2002. EG&G was the only subcontractor on the WICC permitted to share fees with Cube.

Throughout the written proposals[4] submitted to NASA, EG&G was described as Cube's "principal subcontractor," and a large part of the "Cube Team." Each page of both the Initial Proposal and the FPR contained the header, "The Cube Team." The company logos for Cube, EG&G, and another major subcontractor, Unisys, are shown at the bottom of each page of the proposal. Moreover, EG&G's abilities and experience were touted throughout the proposals submitted to NASA, and EG&G was named as the company that would be responsible for several of the SOWs,[5] including the handling of the materials purchasing function. One change from the Initial Proposal to the FPR involved increasing EG&G's responsibilities to include the materials purchasing function for the WICC. This change addressed one of the concerns that NASA and the Navy raised with Cube upon review of the Initial Proposal. In its Initial Proposal, Cube had proposed to handle the purchasing function, but it lacked demonstrable qualifications sufficient to assure the Government that Cube could perform the function. EG&G, on the other hand, possessed

---

[4] "Written proposals" refer to both the Initial Proposal and the FPR.

[5] The SOWs in which EG&G was responsible for included: SOW 7 (Chemical and Biological Laboratory Support Services); SOW 8 (Environmental Management Support Services); SOW 11 (Emergency Services); SOW 12 (Telecommunication and Engineering Support Services); SOW 13 (Information Resources Management Services); SOW 14 (Technical Services); SOW 15 (Logistics); and SOW 16 (Financial Resources Management Services).

the requisite qualifications. By assigning this latter function to EG&G, the parties apportioned approximately 41% of the total proposed cost for Year One of the WICC to EG&G. The assignment of the purchasing function to EG&G afforded EG&G the opportunity to earn a fee on the WICC that was consistent with the parties' original intent in the Teaming Agreement, that EG&G would perform up to 49% of the WICC. For subsequent years of the WICC, EG&G's proposed proportion of costs equaled approximately 43% of the total proposed cost.

Unbeknownst to EG&G, Cube in its final Cost Proposal offered to limit the G&A rates to 3.9% of the total contact costs. Although Cube's proposed cap on G&A rates arguably made its proposal more attractive to NASA and the Navy, such a cap was never discussed with EG&G prior to the submission of the final Cost Proposal, nor did Cube suggest to EG&G that it adopt a cap on its G&A rates. Testimony of Thomas Walter, September 11, 2002.

On July 26, 2001, NASA and the Navy awarded the WICC to Cube, as a cost reimbursement, incentive fee, award fee/award term contract. This meant that under the prime contract, Cube and its subcontractors would be paid for their actual costs incurred in performing the contract based on the fully-loaded labor rates proposed and accepted by NASA. In addition to recovering its costs, Cube as the prime contractor could earn a fee, the amount of which was determined under the prime contract based on whether actual costs incurred by Cube were under, over, or at the target cost established for each contract year.

The phase-in period for the WICC took place during August 2001, after which the WICC was to have a base period of four years and six one-year option periods,[6] referred to as "Award Terms," in the contract. During the phase-in period, Cube began hiring employees to work on the WICC, as did EG&G and other subcontractors.

In mid-August 2001, Cube hired Robert Coffman to be the contract manager for the WICC. Mr. Coffman on behalf of Cube executed letter subcontracts[7] with Cube's subcontractors in order to establish interim terms for each subcontractor's performance under the WICC for a ninety-day period.

---

[6] The WICC did not guarantee that the contract would extend for a full ten years. Rather, the WICC included a Section G.7 that set forth the criteria governing NASA's exercise of the six optional award terms. This section provided that Cube would be required to achieve specified technical performance and cost goals before it would be entitled to the award of the six option periods. If Cube failed to achieve the requisite technical performance rating and cost budget goal in years three or four of the base period, then neither Cube nor its subcontractors would be eligible to perform the WICC beyond the four-year base period.

[7] A letter subcontract is a temporary agreement that allows work on a government contract to begin while the parties (usually the Government and its prime contractor) are working out the details of a definitized contract.

During this phase-in period, Cube intended to negotiate the details of a definitized subcontract agreement with its subcontractors. Mr. Coffman was also responsible for drafting the "definitized" subcontracts for the WICC. "Definitized" contracts refer to subcontracts that include comprehensive terms and provisions.

On or about August 27, 2001, Mr. Coffman sent a proposed letter subcontract ("Letter Subcontract") to the Vice President of Business Operations for EG&G's Installations and Logistics Division, Mr. Thomas Walter. The Letter Subcontract's period of performance was designated as September 1, 2001, through November 30, 2001, unless the parties mutually negotiated a definitized subcontract by November 30, 2001. The Letter Subcontract further stated that the period of performance for the definitized subcontract would be a period of one year starting on September 1, 2001, and that additional option periods would be provided "to the subcontractor on the same basis as provided to the contractor." Letter Subcontract of August 27, 2002, Def. Ex. 5.

Mr. Walter reviewed the proposed Letter Subcontract, which stated that EG&G would perform SOWs 7, 8, 11, 12, 13, 14, 15, and 16 under the WICC,[8] and provided a budget of $1,500,000.00 for the ninety-day period covered by the Letter Subcontract. On August 29, 2001, after editing the proposed Letter Subcontract to reflect the parties' agreement that EG&G's subcontract was to be coextensive with Cube's prime contract, the WICC, Mr. Walter executed the Letter Subcontract on behalf of EG&G and faxed the executed copy to Mr. Coffman at Cube. That same day, Mr. Coffman executed the Letter Subcontract on behalf of Cube and returned the fully executed signature page to Mr. Walter.

Performance on the WICC officially began on September 1, 2001. During the course of its performance, EG&G submitted regular invoices for its actual costs[9] to Cube. EG&G also submitted a monthly invoice for a fee equal to 4% of EG&G's total monthly costs. Under the WICC, Cube can claim 4% of its costs from the fee pool that it proposed each month. At the end of each year, the total fee pool is calculated according to how Cube has performed against

---

[8] The Letter Subcontract refers to Statements of Work (SOW) and Work Breakdown Structures (WBS) and specifically refers to EG&G's responsibilities as WBSs. In addition to its "baseline" responsibilities within each SOW, each SOW for which EG&G is responsible occasionally requires EG&G to propose and perform work on an "Indefinite Delivery Indefinite Quantity" (IDIQ) basis within EG&G's SOWs.

[9] "Actual costs" include labor, overheard, fringe, and G&A. Additionally, when EG&G performs IDIQ work (see *supra*), its costs for that work are reflected in its regular invoices to Cube. Fees earned on IDIQ work are also included in EG&G's regular fee invoices to Cube.

its target costs, and any additional amounts awarded to Cube and not claimed during the year are distributed to Cube. EG&G's portion of this annual fee directly relates to the proportion that its work in dollars bears to all baseline work performed on the WICC. With each submittal, Cube processed and paid EG&G's invoices for both cost and fee. Cube continued to do such, despite apparent cost increases that Cube was experiencing, and had been aware of, as early as August 2001.

According to Cube, NASA, during the phase-in period, "strongly encouraged" Cube and its subcontractors to hire incumbent personnel who had been providing services to NASA under the contracts that preceded the WICC. Many of the predecessor incumbents were either employed in professional positions exempt from the minimum wage requirements imposed upon government contractors or were union members covered by collective bargaining agreements between predecessor contractors and the representative labor unions. Given these circumstances, Cube learned that their labor rates would be higher than those proposed in the FPR submitted to NASA in response to the RFP. Cube's concern over potential cost budget overruns would prove to be a major factor that influenced many of its future decisions with respect to its business relationship with EG&G.

Although the original Letter Subcontract of August 29, 2001, was to last only ninety days, the parties did not finalize a Definitized Contract in that period of time. To allow EG&G's performance to continue while the parties negotiated the Definitized Contract, Cube extended the term of the original temporary Letter Subcontract to EG&G several times over the course of ten months. Between November 2001 and June 2002, Cube issued nine separate Letter Subcontract extensions to EG&G, which extended and basically, although not exactly, mirrored the terms of the initial Letter Subcontract.

In late January 2002, Cube and EG&G met to discuss the terms of a Definitized Subcontract. Cube sent a first draft of the proposed Definitized Subcontract to EG&G on or about October 30, 2001. The parties' discussions focused on Cube's desire to take over and perform the purchasing function under the WICC, a task that was currently being performed by EG&G. The parties discussed how the parties would split the fee pool when it was reconciled at the end of each contract year.

At the January 31, 2002, meeting, the parties reached an agreement on the purchasing function and the fee split and memorialized such in a February 21, 2002, letter sent by Mr. Coffman at Cube to Mr. Walter at EG&G. EG&G agreed to transfer the purchasing function to Cube. In exchange, Cube agreed to guarantee a fee split of 41% to EG&G irrespective of costs. Testimony of Thomas Walter, September 11, 2002.

A few days after making this agreement, however, the Vice President of Contracts and Pricing for Cube, John Schultheis, called EG&G to rescind the agreement with respect to the fee split. Instead, Mr. Schultheis insisted that the fee be shared based on EG&G's proportion of actual costs compared to total contract costs, pursuant to the parties' original understanding. See *supra*. As a result of Cube's withdrawal of the agreement, the purchasing function was not transferred from EG&G to Cube.

On April 9, 2002, Mr. Coffman forwarded a new draft Definitized Subcontract to EG&G for review. In a cover e-mail, Mr. Coffman noted two new major points to be considered under the draft, namely a proposed cap on EG&G's allowable G&A rate[10] and a termination for convenience clause without limitation.

Cube claims that this latter termination provision was also part of the first draft of the Definitized Subcontract submitted to EG&G in October 2001. The WICC included a termination clause from the Federal Acquisition Regulation ("FAR") (Def. Ex. 28), which governs federal procurement activities, at FAR Clause 52.249-6 (48 C.F.R. § 52.249-6 (2002)). The termination clause in the WICC provides that NASA may terminate the prime contract in the event of Cube's default of its contractual obligations and it may terminate the prime contract at any time, in whole or in part, for NASA's "convenience" if it is determined that such termination is in the Government's interest. The October 2001 draft subcontract sent by Cube to EG&G incorporated by reference the same FAR clause 52.249-6, although the clause itself was not set out. By incorporating this clause in the first draft subcontract, Cube allegedly proposed to have the right to terminate the subcontract either for default or for convenience.

From that point on, the parties' negotiations revolved around the issues of a cap on EG&G's G&A rate and a termination for convenience clause in the Definitized Subcontract. In continuing correspondence from April through June 2002, EG&G contended that Cube's attempt to insert these terms in a Definitized Subcontract were contrary to the agreement that the parties had reached pursuant to their Teaming Agreement. Notwithstanding, Cube insisted that EG&G agree to cap its G&A rate at 3.9% for all remaining years under the contract and accept a termination for convenience clause. Cube cited anticipated cost overruns beginning in Year Two of the WICC, and Cube's need to control costs under the contract, for its necessity to cap EG&G's G&A rate. See *supra*.

---

[10] EG&G in its confidential initial submission to NASA had proposed an 8.77% G&A rate, nearly twice as high as the 3.9% G&A rate cap proposed by Cube.

In an effort to make concessions and move the negotiations of a Definitized Subcontract forward, EG&G offered to cap its G&A rates at 6.5% for Years Two through Five of the WICC; at 6.34% for Year Six; and at 6.32% for Years Seven through Ten of the contract, if awarded. EG&G also agreed to accept most of Cube's proposed form of termination provision, with the exception of the paragraph which would permit Cube to terminate EG&G based on another subcontractor's poor performance. See *supra*. After EG&G refused to incorporate the above-mentioned FAR provision by reference, instead offering a termination clause that would permit Cube to terminate EG&G for cause, namely, failures by EG&G to meet performance and budget targets, Cube responded with its own proposed termination clause which, in part, would allow Cube to terminate EG&G for "cause" based upon the failure of the entire "Cube Team" to meet performance and budget targets, even if EG&G were able to meet its individual targets.

Cube rejected EG&G's offers to compromise. On June 25, 2002, Cube sent EG&G a letter declaring that the parties had reached an "impasse" in their negotiations of a Definitized Subcontract. Cube notified EG&G that the Letter Subcontract of June 14, 2002, would be allowed to expire on June 30, 2002,[11] and gave EG&G only five or six days to remove more than 100 of its employees from Wallops Island. Testimony of Robert Coffman, September 12, 2002.

In response to these circumstances, on June 27, 2002, EG&G filed a Bill of Complaint seeking specific performance of the Teaming Agreement[12] and a permanent injunction enjoining Cube from terminating EG&G as a subcontractor on the WICC, together with a Motion for Preliminary Injunction. This Court issued a ninety-day temporary injunction to preserve the status quo until the merits of EG&G's claims could be heard.

Over the course of three days, commencing on September 11, 2002, the merits of EG&G's claims were tried before this Court.

Specifically, EG&G asserts that specific performance is appropriate in this case, where all of the essential terms of the promised contract are established through mechanisms provided for in the Teaming Agreement. EG&G also claims that those essential terms are supported by substantial evidence, including the parties' Initial Proposal and FPR, the Letter Subcontracts, and the parties' performance under the WICC since September 1, 2001.

---

[11] Cube insisted, however, that EG&G continue to perform its functions under the WICC through July 15, 2002, when Cube would assume responsibility for those areas.

[12] Specifically, EG&G seeks to enforce the parties' Teaming Agreement by requiring specific performance of Cube's promise that EG&G will be a subcontractor on the WICC.

Additionally, EG&G claims that, if Cube is allowed to terminate EG&G as a subcontractor on the WICC, a major government contract, such will cause EG&G irreparable harm, thereby making its request for permanent injunctive relief appropriate. Specifically, EG&G claims termination will cause irreparable harm to its business reputation and good will, particularly with its NASA and Navy Customers, and that it will lose both government contracting opportunities and certain commercialization opportunities.

Based upon the RFP, EG&G contends that it is the Government's expectation that Cube and its team members on the WICC will seek business opportunities to commercialize portions of the functions being performed under that contract in order to reduce costs to the Government, opportunities that EG&G will lose if Cube is permitted to terminate the contract. Additionally, EG&G points out that Cube's termination of EG&G may result in unwarranted negative inferences by future government contracting officers when examining its past performance on the WICC.

In its defense, Cube alleges that the Teaming Agreement is not itself a subcontract between the parties setting forth the particulars of each party's performance of the WICC. Rather, Cube characterizes the Teaming Agreement as an unenforceable "agreement to agree." *Defendant's Proposed Findings of Fact and Conclusions of Law*, ¶ 72. Cube argues that the Teaming Agreement only provides that, if the parties are successful in having the WICC awarded to Cube, they would then agree to enter into "a prime/subcontract agreement for the sole purpose of performing the contract [the WICC] requirements" and that "The Cube will enter into a formal subcontract agreement upon award." Cube further contends that the agreements[13] the parties did make and the parties' conduct over the past year constitute nothing more than evidence that Cube and EG&G "intended to be bound under a subcontract only if the formal subcontract[14] was prepared and signed." *Defendant's Proposed Finding of Fact and Conclusion of Law*, ¶ 73. Notwithstanding, Cube concedes that its decision not to renew the extension of the Letter Subcontract Agreement to EG&G was based solely on the parties' failure to reach an agreement as to two terms of the definitized subcontract, a cap on EG&G's G&A rate and a termination for convenience

---

[13] "Agreements" here refer to both the Teaming Agreement and the Letter Subcontract entered into by the parties and extended eight times over the course of ten months. Cube argues that EG&G and Cube entered into the Letter Subcontract with the intent that such would govern performance under the WICC on an interim basis only until they negotiated and reached a final definitized subcontract.

[14] This refers to the Definitized Subcontract under negotiation.

clause. See both trial and deposition testimony of John Schultheis, presented September 16, 2002.

## Discussion

The issue presented is whether the Teaming Agreement, the Initial and Final Proposals, and the Letter Subcontracts entered into by EG&G and Cube contain essential terms sufficient to govern the parties' performance on the WICC and whether the parties had the requisite intent to be bound by such terms, so as to constitute an enforceable subcontract?

Teaming agreements are special arrangements among different companies that are commonly used in connection with federal procurements of numerous and various types of services. *See Northrop Corp. v. McDonnell Douglas Corp.*, 705 F.2d 1030 (9th Cir. 1983); *Experimental Eng'g v. United Tech Corp.*, 614 F.2d 1244 (9th Cir. 1980); *Air Tech v. General Elec. Co.*, 347 Mass. 613, 199 N.E.2d 538 (1964); *see also Colsa Corp. v. Martin Marietta Servs., Inc.*, 133 F.3d 853 (11th Cir. 1998). Prime contractors often enter into such agreements with other companies known to have specialized experience in providing discrete types of services in anticipation of submitting a bid in response to a government agency's request for proposal. Thus, pursuant to such an agreement, subcontractors generally provide technical expertise, financial support, and other general assistance in preparing the prime contractor's bid submission in exchange for the prime contractor's promise to award a subcontract. *See Atacs Corp. v. Trans World Communications, Inc.*, 155 F.3d 659, 666 (3d Cir. 1998).

The federal government acknowledges the validity and desirability of teaming agreements and recognizes that such agreements permit the government contracting industry to "offer the government the best combination of performance, cost, and delivery." *See FAR 9.602(a)(2); see generally FAR 9.601 et seq.* Moreover, government agencies routinely consider proposed subcontractors when evaluating proposals. *See FAR 9.103(c), FAR 9.104-4; see also John Carlo, Inc. v. Corps of Engineers of the United States Army*, 539 F. Supp. 1075, 1077 (N.D. Tex. 1982).

The validity and desirability of such agreements notwithstanding, for any contract to be enforceable, there must be mutual assent of the contracting parties to terms reasonably certain under the circumstances. *See Allen v. Aetna Casualty & Surety*, 222 Va. 361, 281 S.E.2d 818 (1981). That is, a contract cannot exist if the parties never mutually assented to terms proposed by either as essential to an accord. *Progressive Construction v. Thumm*, 209 Va. 24, 30-31, 161 S.E.2d 687, 691 (1968). Thus, where the evidence is that the parties

merely *agreed to make an agreement* in the future and where a determination of the terms and conditions under which the obligation would be assumed are vague and uncertain, Virginia law treats such agreements as unenforceable "agreements to agree." *Allen v. Aetna Casualty & Surety*, 222 Va. 361, 281 S.E.2d 818 (1981).

In considering whether an agreement is an enforceable contract or merely an agreement to agree, courts consider not only whether the document at issue includes the requisite essential terms, but also whether the conduct of the parties and the surrounding circumstances evince the parties' intent to enter into a contract. *See High Knob v. Allen*, 205 Va. 503, 138 S.E.2d 49 (1964). A teaming agreement is an enforceable contract if it is clear that the parties intended to enter into a binding contractual relationship and the agreement contains sufficient objective criteria to enforce. *Atacs Corp.*, 155 F.3d at 666; *see generally*, E. Allan Farnsworth, *Precontractual Liability and Preliminary Agreements: Fair Dealing and Failed Negotiations*, 87 Colum. L. Rev. 217 (1987); Brent E. Newton, *Note, The Legal Effect of Government Contracting Teaming Agreements: A Proposal for Determining Liability and Assessing Damage in Event of Breach*, 91 Colum. L. Rev. 1990 (1991).

## Agreement or Agreement to Agree?

Cube argues that the Teaming Agreement between it and EG&G was nothing more than an agreement to agree. According to Cube, the parties regarded the Teaming Agreement as simply a "formal vehicle with a single purpose: to establish an exclusive relationship to prepare and submit a winning proposal for the WICC." *Defendant's Proposed Finding of Fact and Conclusions of Law*, ¶¶ 63, 64. In other words, Cube argues that neither it nor EG&G intended the Teaming Agreement to state the terms of a subcontract between Cube and EG&G for performance of the WICC. *Id*. at ¶ 65. Rather, Cube contends that the intention of the parties was that a subcontract would be entered into as a result of good faith negotiations that would occur if Cube were awarded the WICC. *Id*.

In support of its contentions, Cube relies on the cases of *W. J. Shafer Assocs., Inc. v. Cordant, Inc.*, 254 Va. 514, 493 S.E.2d 512 (1997), and *Dual, Inc. v. Symvionics, Inc.*, No. 97-1228, 1997 U.S. App. LEXIS 23959 (4th Cir. 1997) (unpublished).

In *Shafer*, the Virginia Supreme Court addressed the issue of whether a so-called "teaming agreement" constituted an enforceable contract for the sale of digitizers. *Shafer*, 254 Va. at 516, 493 S.E.2d at 513. The Court found the teaming agreement to be merely an agreement to agree in the future in the

event that Cordant became the prime contractor on the project. 254 Va. at 520, 493 S.E.2d at 515. In finding the contract unenforceable, the Court noted that there was no mutual commitment by the parties, no obligation on the part of one of the defendants to sell the digitizers or on the part of the plaintiff to purchase them, no agreed purchase price for the product, and no assurance that the product would be available when needed. *Id.*

In *Dual, Inc. v. Symvionics, Inc.*, 1997 U.S. App. LEXIS 23959 (4th Cir. 1997) (unpublished), the United States Court of Appeals for the Fourth Circuit held that a teaming agreement between a prime contractor and subcontractor was not enforceable.[15] The Court of Appeals reasoned that the teaming agreement between Symvionics, the prime contractor, and Dual, the subcontractor, did not require Symvionics ultimately to enter into the subcontract with Dual, but only to negotiate in good faith to arrive at such a contract. The Court in *Dual* acknowledged that under California law, which governed that case, the parties may contract to create the obligation to negotiate in good faith with one another as long as they did not require formation of the subsequent contract. *Dual, Inc. v. Symvionics, Inc.*, No. 97-1228, 1997 U.S. App. LEXIS 23959 (4th Cir. 1997) (unpublished).

Neither of these cases is dispositive of the issue presented here. First, unlike the facts set forth in *Shafer*, the facts in the present case do support a finding of mutual commitment between the parties with respect to the level of EG&G's involvement and type of work that EG&G would perform if Cube were awarded the WICC contract.[16] Moreover, contrary to the Court's finding

---

[15] In *Dual*, Symvionics, the prime contractor, and Dual, a subcontractor, entered into an agreement by which the contractor used the subcontractor's bid in its proposal to the United States Air Force (USAF) to build a flight simulator. After the proposal was submitted, Dual's anticipated costs increased substantially. USAF informed Symvionics that Dual's proposed costs were excessive. In response to USAF's concern about its costs, Dual agreed to reduce it costs to a "firm fixed price." Based in part on Dual's agreement to reduce its costs, USAF awarded the prime contract to Symvionics based on the latter's bid which included Dual as the subcontractor. Subsequent to being awarded the bid, Dual and Symvionics signed a Letter Subcontract allowing Dual to begin work on the project. Meanwhile, Symvionics and Dual began negotiating the subcontract. Nine months into the project, however, Dual informed Symvionics that its costs had increased significantly. Concerned over these cost increases and that Symvionics might lose the simulator contract because of difficulties in completing the subcontract in time for USAF's Preliminary Design Review and possessed of additional information that Dual had acted in bad faith, Symvionics terminated its negotiations with Dual.

[16] See generally *supra*. Additionally, the facts in *Shafer* are quite different from those here. In *Shafer*, Cordant, the successful general contractor, as is Cube here, was suing its subcontractor, there Shafer, as is EG&G here, under the teaming agreement. Cordant asserted that Shafer had agreed to furnish digitizers if Cordant were selected as prime contractor. No terms of sale were agreed to whatsoever. There was no price for the product

in *Shafer*, this Court does find an affirmative obligation on the part of the Cube to subcontract those portions of the WICC it promised to EG&G. Indeed, EG&G's work on both the Initial and Final Proposals was performed in, and served as, consideration for Cube's promise.

The facts set forth in *Dual* are also distinguishable from the facts of the present case. In *Dual*, it was the substantial increase of the *subcontractor's* anticipated costs over and above those costs previously agreed to by the parties, not an increase of the prime contractor's costs,[17] *combined with evidence of bad faith on the part of the subcontractor*, which factored into the prime contractor's decision to terminate negotiations with the subcontractor. Here, the facts do not suggest a scintilla of bad faith on the part of EG&G, nor has Cube presented any evidence that EG&G is in breach of any prior agreement with respect to the amount of G&A that EG&G can charge. The facts are not at all similar. Everything was agreed to here except minor functional details. And the testimony at trial made clear that those details were resolved by the parties and never an issue at all.

### Intention of Parties

Consideration must be given to the intention of the parties, and such intention should be given effect. *High Knob, Inc. v. Allen*, 205 Va. 503, 508, 138 S.E.2d 49, 53 (1964). To arrive at this intention, regard is to be had to the situation of the parties, the subject matter of the agreement, and the object which the parties intended. *Id.* Here, it is plain that the parties intended to act, in effect, as partners in performing the WICC contract. EG&G had the lion's share of the SOWs, EG&G was the key subcontractor, and EG&G was essential to Cube's receiving the award of the WICC contract.

Settled law makes clear that, if the parties do not intend to be bound until a formal contract is prepared, there is no contract. *Boisseau, Trustee v. Fuller*, 96 Va. 45, 30 S.E. 457 (1898). And circumstances which show that the parties do intend a formal contract to be drawn up is strong evidence demonstrating that they did *not* intend the prior negotiations to amount to an agreement. *Id.*

Conversely, where there is a proposal or agreement made in writing where it is not expressly stated to be subject to a formal contract, it becomes a

---

or even an assurance of its availabili' . Here, all of the relevant terms were agreed to by Cube and EG&G. Furthermore, there is no product here, only services, all of which were fully set out and all of which have been satisfactorily performed to date and all of which have been paid for by Cube.

[17] At trial, Mr. Jay Huston, Cube's Project Manager on the WICC, testified that Cube, not EG&G, experienced cost increases over the course of the WICC project. Testimony of Jay Huston, September 12, 2002.

question of construction whether the parties intended that the terms agreed on should merely be put into form or whether they should be subject to a new agreement, the terms of which are not expressed in detail. *Boisseau, Trustee v. Fuller*, 96 Va. 45, 30 S.E. 457 (1898). If the parties are fully agreed, however, there is a binding contract, notwithstanding the fact that a formal contract is to be prepared and signed. *Boisseau, Trustee v. Fuller*, 96 Va. 45, 30 S.E. 457 (1898).

Cube argues that the agreements the parties did make[18] and the parties' conduct constitute strong evidence that Cube and EG&G intended to be bound under a subcontract *only if* a formal subcontract were prepared and signed. The evidence does not support such a conclusion.

First, unlike the circumstances set forth in either *Shafer* or *Dual*, the Teaming Agreement and subsequent proposals required Cube to do more than just "negotiate in good faith" to arrive at a final subcontract. Cube itself admits that the Teaming Agreement required EG&G to work with Cube in an "exclusive" relationship to prepare a response to the RFP for the WICC. See *Defendant's Proposed Findings of Fact and Conclusions of Law*, ¶ 10. In exchange for EG&G's efforts on the proposal, the Teaming Agreement expressly stated that, if Cube were awarded the WICC as prime, EG&G *would* be a subcontractor on the WICC and perform a substantial amount of the work, up to 49%, under the government contract. *Id.* at ¶ 11.

Second, in the context of teaming agreements, the court may examine the parties' conduct, including any proposals submitted in response to a government RFP, to ascertain whether they intended that the proposed subcontractor receive a subcontract upon award to the prime. See *Experimental Engineering, Inc. v. United Technologies Corp.*, 614 F.2d 1244, 1246-47, n. 2 (9th Cir. 1980).[19] The language of both the Teaming Agreement and the subsequent proposals submitted to NASA makes clear that it was the plain intent of both EG&G and Cube that EG&G would be awarded a subcontract upon Cube's award of the WICC project. This understanding that the parties would work together as prime and subcontractor on the WICC from the time of an award until June 2002 is further confirmed by the parties' performance.

---

[18] Again, "agreements" as used here refers to the Teaming Agreement, the Initial and Final Proposal, and the subsequent Letter Subcontracts.

[19] In *Experimental Engineering*, the Ninth Circuit held that summary judgment in favor of the prime contractor was inappropriate where a proposed subcontractor alleged that the temporary Authorization Agreement between it and the prime contractor was not the *only* subcontract that the parties envisioned and when the subcontractor provided support for the prime's proposal to the government, which itself described the prime and the subcontractor as a "team." *See also Air Technology Corp. v. General Electric Co.*, 199 N.E.2d 538, 546 (Mass. 1964) (looking to parties' conduct to infer intent that proposed subcontractor and "team member" would receive a subcontract upon award of the prime contract).

Third, EG&G was more than just a name arbitrarily included in Cube's Initial and Final Proposals. EG&G's abilities and experience were touted throughout Cube's proposals submitted to NASA. Moreover, EG&G was described as Cube's "principal subcontractor" and a large part of the "Cube Team" and was named as the company that would be responsible for several of the SOWs. EG&G spent more than $70,000 in direct bid and proposal costs for preparing the WICC proposal. In addition, EG&G spent significant time and effort on the WICC proposal that is not accounted for in the bid and proposal numbers.

Most importantly, the agreement was not that EG&G "might" be a subcontractor "if" an agreement were worked out, but "would" be a subcontractor pursuant to previously agreed upon terms as to job responsibilities, compensation, and duration.

In sum, the Court finds both the requisite intent and sufficient criteria to enforce the Teaming Agreement. The clear intent of the parties was to establish a close working relationship and to work together post-award for the entire duration of the WICC. This intent is evidenced by the terms of the Teaming Agreement, the parties' conduct, and the circumstances surrounding the parties' proposals for the WICC contract, the Letter Subcontracts, and the subsequent performance on the WICC.

*Parties' Performance*

Additionally, the parties' subsequent performance and dealings with each other over the last year are informative in determining the meaning of particular contract terms at issue in this case.

> The dealings of the parties to a contract in relation to its terms are often conclusive upon questions arising as to the effect or meaning. This may be because the parties have deliberately and mutually disregarded its plain terms, or because they have so dealt with each other as to definitely fix the meaning of the terms, which would otherwise be of doubtful import. In the former case, their plain rights have been waived. In the latter case, the doubtful rights of the parties have been fixed by their practical dealings with each other.

*First Nat'l Exchange Bank v. Roanoke Oil Co.*, 169 Va. 99, 115-16, 192 S.E. 764, 771 (1937) (citations omitted). The parties have operated under the agreements without any confusion as to the terms, the responsibilities, the work to be performed, and, very importantly, the method of determining the amount of compensation.

## Essential Terms

Finally, Cube argues that the promise in the Teaming Agreement relied upon here by EG&G, that Cube committed to entering into a subcontract, is similarly not enforceable where certain material subcontract terms were not mutually agreed to in the Teaming Agreement. Specifically, Cube argues that the parties did not come to an agreement with respect to the G&A rate that EG&G could charge under an agreed upon subcontract and the parties' rights concerning the termination of the subcontract. *Defendant's Proposed Findings of Fact and Conclusions of Law*, ¶ 74.

The Court notes that, on the one hand, Cube states that "material" terms regarding G&A and termination were never agreed to by the parties, thus rendering the contract unenforceable. But, on the other hand, Cube, in defending allegations of bad faith with respect to its attempt to add a termination for convenience provision in the subcontract, states that such a provision was already a term of the contract between the parties.

This apparent contradiction notwithstanding, the Court does not find Cube's arguments persuasive. At trial, the testimony of several witnesses confirmed that Cube, in an e-mail to EG&G dated April 9, 2002, see Compl. Ex. 21, intentionally flagged the issue of a cap on G&A, *as well as the termination for convenience clause*. The Court finds such behavior on the part of Cube inconsistent with the notion that such a provision was already contemplated and agreed to by the parties. Rather, the Court finds such an act to be more consistent with that of one attempting to *add new terms* to already existing understandings, and in the context of all the other circumstances, an act of bad faith on the part of Cube.

In Virginia, the essential terms of a contract for services are (1) the nature and scope of the work to be performed, (2) the compensation to be paid for that work, (3) the place of performance, and (4) the duration of the contract. *See Mullins v. Mingo Lime & Lumber Co.*, 176 Va. 44, 50, 10 S.E.2d 492, 494 (1940). Although the G&A rate and termination rights are material terms in that they involve both price and duration, the Court finds that the parties' seeming failure to agree to such terms is irrelevant where the intent of the parties as to these terms is otherwise clear. *High Knob* at 508-09. In *High Knob*, the court held that, although the agreement did not specify the amount of water to be provided or the length of time the developer would be required to provide it, there was partial performance of the agreement and the intent of the parties, while not expressed in the agreement, was ascertainable from their conduct and the circumstances.

First, as EG&G points out, at the time the parties executed the Teaming Agreement, the parties were not yet in a position to specify certain terms of EG&G's anticipated contract with Cube, as NASA and the Navy had not yet issued the RFP for the WICC. As for those areas the Teaming Agreement did address, Article 2.2 of the Teaming Agreement describes the work that EG&G will perform, "certain functional areas as a subcontractor to The Cube … with the functions to be determined, once the RFP is released." Def. Ex. 1. Yet these were not contractual matters; they were descriptions and details as to specific items of work to be performed. There was never any disagreement, and neither party so asserted, about whether EG&G would perform these "functional areas" of work.

Second, the subsequent proposals submitted to NASA clearly stated the scope and nature of the work that EG&G was to perform as subcontractor on the WICC. Such was further clarified and confirmed in the Letter Subcontracts and, also importantly, by EG&G's performance. It is clearly apparent from the evidence that the parties agreed that EG&G would perform certain and definite functional areas under the WICC. EG&G has been performing both the baseline work under those functions, as well as the IDIQ work that has arisen in those areas for the last year, and is thus plainly able to perform these functions. Even Cube has not suggested that any of these items presented any areas of disagreement.

Third, the parties agreed how EG&G was to be compensated for its work. Exhibit 1 to the Teaming Agreement states that Cube "will agree with EG&G Logistics at the time of proposal submission on a fully loaded fee structure, to be used by both The Cube and EG&G Logistics." Def. Ex. 1. Specifically, the parties agreed that EG&G was to receive payment from the Government of its costs. At the time the proposals were submitted, EG&G offered, and Cube accepted, EG&G's summary cost data representing its anticipated fully loaded costs, including labor, other direct costs, G&A, and overhead, projected over the entire ten-year term of the WICC. The Court notes that at no time during its negotiations with EG&G did Cube request a detailed break-down of the fully-loaded labor rates submitted by EG&G. Rather, EG&G submitted a detailed break-out of its costs directly to NASA. Testimony of Thomas Walter, September 11, 2002. Although some of EG&G's actual costs may have changed during the parties' performance of the WICC,[20] EG&G has submitted invoices representing the actual costs incurred, using the same summary

---

[20] Under its terms, a fluctuation in costs does not upset the agreement as to the compensation provisions.

format structure as when EG&G's costs were initially proposed. Cube has paid these invoices without question or complaint.

Fourth, the parties agreed that EG&G is entitled to share in the fee pool that Cube proposed to the Government and that was incorporated into the WICC. See *supra*. Both parties assumed that EG&G's share of the fee would correspond to its proportion of work, based on costs incurred, to total costs incurred for the entire contract.[21] These terms, too, are not in dispute.

Finally, the parties' failure to agree upon a cap on EG&G's G&A rate and a termination for convenience clause is entirely attributable to Cube's failure to bargain in good faith. The Court finds that the disagreements that Cube testified to as preventing it from complying with its obligation to enter into a Definitized Subcontract with EG&G[22] were problems that Cube created in an attempt to renegotiate, or, in the case of the termination for convenience clause, newly negotiate essential terms of the parties' already established agreement.

More specifically, Cube's demand that EG&G cap its G&A rate at 3.9% is contrary to the parties' clearly established agreement on how EG&G is to be compensated. Similarly, Cube's insistence upon a termination for convenience clause that would permit it to terminate EG&G either "for cause" based upon the failure of the entire "Cube Team" to meet performance and budget targets, as opposed to just EG&G's failure, or for any reason whatsoever, is contrary to the parties' intent in the Teaming Agreement and subsequent proposals that EG&G would be a subcontractor for the entire duration of the WICC project.

Mr. Thomas Walter testified that a termination for convenience clause did not reflect the intent of parties. EG&G was akin to Cube's *partner* on the WICC and subject only to a "flow down" termination clause whereby EG&G would be terminated in the event of Cube's termination from the WICC. Testimony of Thomas Walter, September 11, 2002.

Moreover, Mr. Robert Coffman, Cube's Contract Manager on the WICC, testified at trial that there was no provision in its prime contract with NASA requiring the inclusion of a termination for convenience in any of Cube's subcontracts. Additionally, Mr. Coffman testified that the termination for convenience issue was not raised with EG&G until sometime between March

---

[21] Testimony of Thomas Walter, September 11, 2002. Also, according to the figures presented in Cube's FPR, EG&G's estimated share of the annual fee is roughly 41% in Year One of the WICC and approximately 43% thereafter; however, actual performance will dictate the precise sharing of the fee award, just as the parties' performance under the WICC will determine the overall size of the fee that is earned and shared between them.

[22] See *supra*.

and May 2002, some seven months *after* EG&G's performance on the WICC officially began under the initial Letter Subcontract of August 29, 2001.

Although the parties agreed upon execution of the Teaming Agreement and subsequent Letter Subcontracts to agree to the details of a final definitized subcontract, at no time did EG&G agree to *re-negotiate* essential terms already agreed upon and adhered to over a year of performance on the WICC. The Court finds that Cube's attempt to alter the terms, under which the parties have been successfully working, was made in bad faith in order to be able to terminate EG&G in order to reduce Cube's costs, while at the same time increase the amount of fee that Cube could collect under the WICC.

Although Robert Coffman testified at trial that Cube had discussed internally the termination of EG&G from the WICC some three or four months prior to the date when EG&G was officially terminated, Mr. Coffman admitted that no one from Cube ever told EG&G that it might be replaced on the WICC project. Testimony of Robert Coffman, September 12, 2002. Furthermore, EG&G offered testimony at trial that Cube at no time reported any problems with EG&G's performance on the WICC, either before or after the ninety-day temporary injunction issued by the Court on June 27, 2002. Testimony of Clayton Wetsell, September 12, 2002. Moreover, at no time did Cube withhold any payments to EG&G as a result of performance, or lack thereof. Testimony of Jay Huston, September 12, 2002.

Furthermore, insofar as bad faith is concerned, the Court notes that Cube's transmittal of the Letter Subcontracts subsequent to the initial one was at best disingenuous, and at worst fraudulent. Terms were not included that appeared in the terms of the initial Letter Subcontract. Yet these changes or additions were not flagged for EG&G's attention. Compare Compl. Ex. 13 at page EG 03150 with Compl. Ex. 14 at page EG 03166. Cube admitted that this was done so "partially intentionally." Testimony of Robert Coffman, September 12, 2002. Terms that were changed on the transmittals from Cube to EG&G for purportedly routine signature were not flagged for EG&G. See Compl. Ex. 14 at page EG 03196. By Mr. Coffman's own admission at trial, he did not like the Teaming Agreement and set about to "fix" some of its terms, changes that he admittedly did not discuss with Thomas Walter of EG&G. Testimony of Robert Coffman, September 12, 2002. Such conduct plainly smacks of bad faith.

Cube admitted through its Director of Contracts, John Schultheis, that the only two impediments to the definitized subcontract agreement were the cap on G&A and the termination for convenience clause. Yet, after two years of working together on the Teaming Agreement, the Initial and Final Proposals, the Letter Subcontracts, and the negotiations on the Definitized Subcontract,

*only* when the draft of that agreement was reformatted and sent by Cube to EG&G were those two items flagged. Compl. Ex. 21 at page EG 03541. And this was in April 2002. EG&G's surprise was understandable.

And what was Cube's response to EG&G's surprise reaction to these two new terms? Not an assertion that EG&G has already agreed to them. Cube knew full well that EG&G had not. Instead, notwithstanding Cube's new demands, EG&G, in uncontroverted good faith, negotiated over these two newly injected terms to an impasse. (During the negotiations, Cube even suggested buying out EG&G's interest. Cube's wishes to be rid of EG&G for purely monetary reasons could not have been made more plain.)

In sum, the Court finds that the Teaming Agreement, combined with the terms of and subsequent performance under the proposals submitted to NASA and the Navy, constitute a binding and enforceable contract. Even though the Teaming Agreement itself does not set forth the *minor functional details* of the subcontract that EG&G was promised, the *essential contractual terms* were plainly stated in the Teaming Agreement and were in fact agreed upon by the parties during the preparation of their proposals to NASA and the Navy.

Most importantly, Cube could not point to a single term in the drafts and negotiations of the Definitized Subcontract that were of any concern. Indeed, they were substantially all agreed upon. The only stumbling blocks were the two *new* terms, a cap on the G&A rate and a termination for convenience clause, that were never a part of the parties' prior agreement. To the contrary, the parties had agreed on G&A without a cap and had never contemplated a termination for convenience provision. Such a clause in and of itself is antithetical to the concept of partnering or teaming as envisioned and agreed to by EG&G and Cube.

## Remedy

With respect to the remedy that EG&G seeks, the Court finds specific performance not only appropriate, but necessary.

Whether specific performance is an appropriate remedy is a matter of the Court's discretion. *First Nat'l Exchange Bank v. Roanoke Oil Co.*, 169 Va. 99, 117, 192 S.E. 764, 771 (1937). The availability of this equitable remedy depends on whether the party seeking such has an adequate remedy at law and whether the party against whom relief is sought would be subject to undue hardship if the relief is granted. *Id.* Thus, under Virginia law, a party seeking specific performance must demonstrate that there is no adequate remedy at law and that the terms of the contract sought to be enforced are sufficiently

definite. *Manassas v. Board of County Supervisors of Prince William County*, 250 Va. 126, 132-34, 458 S.E.2d 568, 571-72 (1995).

The adequacy of a legal remedy "is to some extent relative, and the modern approach is to compare remedies … [but] doubts should be resolved in favor of the granting of specific performance or injunction." *Restatement (Second) of Contracts*, § 359 (1981). *See also Thompson v. Commonwealth*, 197 Va. 208, 212-13, 89 S.E.2d 64, 67 (1955); *Basicomputer Corp. v. Scott*, 973 F.2d 507, 511 (6th Cir. 1992) ("injury is not fully compensable by money damages if the nature of the Plaintiff's loss would make damages difficult to calculate.")

In the present case, Cube contends that specific performance is not available as a remedy, as no subcontract has been proved and certain of the terms discussed by the parties are not only *not* definite, but categorically not agreed to. *Defendant's Proposed Findings of Fact and Conclusions of Law*, ¶ 79. *See City of Manassas v. Board of Supervisors*, 250 Va. 126, 133, 458 S.E.2d 568, 571-72 (1995). But as previously stated, even if some of the terms of a contract are uncertain, if its meaning may be determined in light of the surrounding circumstances, the contract will be enforced. See *supra*. And, simply put, there are no uncertain terms here.

Moreover, the Court recognizes that a legal remedy is especially difficult to fashion where damages are too speculative to calculate, such as where the contract at issue may be extended or renewed based on performance which has not yet occurred and where extra-contractual opportunities are also lost or jeopardized. *See e.g., Purdue Pharma, L.P. v. Boehringer Ingelheim, G.m.b.H.*, 98 F. Supp. 2d 362 (2000) (injunction granted where future market circumstances made calculation of damages difficult and where, without an injunction, plaintiff would lose future opportunities in the relevant marketplace); *Aero Corp. v. Department of Navy*, 540 F. Supp. 180, 214 (D. D.C. 1982) (lost opportunities constitute irreparable injury "which no legal remedy could either value or redress.").

In this case, due to the award term feature of the WICC, it is uncertain whether the contract will last for only four years or up to ten years. If terminated by Cube, EG&G will have a difficult if not impossible task calculating and quantifying the earnings it might have received under the WICC. Moreover, EG&G's involvement is a factor that arguably affects the success of that contract and whether it is extended to its full ten-year potential.

A second characteristic of the WICC that makes it difficult to calculate damages is that the incentive and award fees that can be earned each year will vary based on performance. Again, if EG&G is terminated from the contract,

it will be unable to help Cube maximize the annual fee pool. In either event, the anticipated profits by virtue of the fee sharing are impossible to forecast.

The Court concludes that the loss of EG&G's participation in the WICC, a major government contract, constitutes a substantial irreparable injury to EG&G that cannot be adequately remedied at law. *See Dairy Maid Dairy, Inc. v. United States*, 837 F. Supp. 1370, 1381 (E.D. Va. 1993); *United Power Corp. v. United States Defense Mapping Agency*, 736 F. Supp. 354, 357 (D. D.C. 1990); *Quality Transport Services, Inc. v. United States*, 12 Ct. Cl. 276, 282 (1987) (because loss of anticipated profits cannot be recovered on a government contract, loss of contract constitutes irreparable harm.). As for Cube, the Court does not believe, based on the evidence, that it will suffer similar substantial harm by the Court's granting EG&G's requested relief and by requiring Cube to live up to the bargain it made with EG&G.

## Conclusion

Upon consideration of the object which the parties here intended to accomplish under the Teaming Agreement, the circumstances under which the Teaming Agreement was made, the parties' negotiated terms in the Teaming Agreement, the Initial Proposal, the RFP, and the Letter Subcontracts, combined with the parties' performance on the WICC over a year, the Court finds that it was the clear and plain intention of the parties that EG&G would, in its capacity as subcontractor, perform on the WICC.

In addition, the Court finds that the essential terms of the subcontract that Cube promised to give EG&G are more than sufficiently clear and definite so as to permit the Court to order the specific performance that EG&G seeks. The parties established all of the essential terms of the promised subcontract through the mechanisms provided for in the Teaming Agreement, and those terms are supported by substantial evidence, including the parties' Initial Proposal and FPR, the Letter Subcontracts, and the parties' performance under the WICC since September 1, 2001. As to the two disputed terms, capping of the G&A rate and termination for convenience, the parties never had as part of their agreement that EG&G would have to cap its G&A rate or that EG&G could be terminated for convenience. Those terms were not a part of the parties' agreement, and, more specifically, were not left open for the parties' negotiations.

*Order*

This matter came before the Court on the Bill of Complaint of EG&G, Inc., on September 11, 12, and 16. For the reasons stated in this Court's opinion letter dated December 23, 2002, which is attached hereto and made a part hereof, the Court finds for the Complainant. Accordingly, the Court will grant specific performance in favor of EG&G, Inc., against The Cube Corporation. The Court further orders that the Defendant be permanently enjoined from terminating EG&G as subcontractor on the WICC, except for good cause as is defined under the Teaming Agreement and Letter Subcontracts previously agreed to and executed by the parties. The Court notes Defendant's exception to this Order.