Present:  Carrico, C.J., Compton, Hassell, Keenan and Kinser, JJ., and Stephenson and Whiting, Senior Justices

W.J. SCHAFER ASSOCIATES, INC.

v.  Record No. 961945

CORDANT, INC.

                    OPINION BY SENIOR JUSTICE ROSCOE B. STEPHENSON, JR.
                              October 31, 1997

LENZAR ELECTROOPTICS, INC.

v.  Record No. 961964

CORDANT, INC.

                    FROM THE CIRCUIT COURT OF FAIRFAX COUNTY
                              Thomas S. Kenny, Judge


     These are appeals of a judgment rendered on separate jury verdicts arising from a single trial.  In Record No. 961945, the dispositive issue is whether a so-called "Teaming Agreement" constitutes an enforceable contract for the sale of goods.  In Record No. 961964, we decide whether promissory estoppel should be recognized as a cause of action.

                                   I

     By an amended motion for judgment filed September 28, 1995, Cordant, Inc. (Cordant) sought damages from Ogden Government Services Corp. (Ogden), W.J. Schafer Associates, Inc. (Schafer), and Lenzar ElectroOptics, Inc. (Lenzar) based upon claims arising out of Cordant's efforts to secure a government contract to convert certain personnel records to a computer-accessible form.  In the motion for judgment, Cordant set forth the following claims:  Count I, breach of contract by Ogden; Count II, breach of contract by Schafer and Lenzar; Count III, promissory estoppel

against Ogden; Count IV, promissory estoppel against Schafer; Count V, promissory estoppel against Lenzar; Count VI, fraud and deceit by Ogden; Count VII, constructive fraud by Ogden; Count VIII, fraud and deceit by Ogden, Schafer, and Lenzar; and Count IX, constructive fraud by Ogden, Schafer, and Lenzar.

After about a three-week trial, the jury returned the following three verdicts in favor of Cordant:  a verdict against Ogden for breach of contract with damages fixed at $0; a verdict against Schafer for breach of contract with damages fixed at $300,000; and a verdict against Lenzar for promissory estoppel with damages fixed at $150,000.  The trial court entered judgment on the verdicts, and Schafer and Lenzar appeal.[1]

II

On April 15, 1991, the United States Air Force issued a Request for Proposal (RFP), seeking bids for its project to convert its personnel records stored on microfiche to a system of electronic data accessible by computer.  The system was known as "Automated Records Management System" (ARMS).

For nearly two years prior to the RFP, Cordant, a computer and telecommunications integration systems company, prepared to submit a bid as a prime contractor.  The ARMS project required Cordant to procure software and equipment necessary for "scanning" or "digitizing" the microfiche.

---

[1]The trial court had struck Cordant's evidence relating to the fraud claims.

In preparing to bid on the project, Cordant solicited pricing and product information from various companies, including Ogden. Ogden was a software development firm with prior experience on Air Force contracts and expertise in the type of software necessary for the ARMS project. Ogden also had a corporate affiliation with Schafer, another technology company that had been developing image scanning equipment known as "digitizers." Cordant believed that having access to Schafer's digitizer would enhance its chances of securing the Air Force contract.

On May 24, 1991, Ogden signed a document with Cordant entitled "Teaming Agreement," and Cordant signed the document on July 23, 1991.[2] The Teaming Agreement provided, in pertinent part, that Cordant would "propose" Ogden to the Air Force as "an exclusive Subcontractor" for the products and services set forth in Exhibit A to the Agreement. Ogden would "supply pricing" for the products and services listed in Exhibit A, which specifically included software development services and the Schafer digitizer. Cordant and Ogden each would "bear its own costs, risks and liabilities incurred as a result of its obligations and efforts under [the] Agreement," and neither party would have the "right to any reimbursement, payment, or compensation of any kind from the other party during the period prior to the Government

_____

[2]At the time of the Agreement's execution, Cordant was known as Centel Federal Systems, Inc., and Ogden was known as Evaluation Research Corporation.

contract."  Cordant and Ogden also agreed that, if Cordant became the prime contractor of the ARMS project, they would "negotiate in good faith in a timely manner a Subcontract Agreement."  Cordant reserved the right, "in its sole discretion to withdraw its participation from this procurement at any time prior to award [of a contract by the Air Force] if [Cordant] determin[ed] that such withdrawal [was] in [its] best interest."  The parties agreed that the Teaming Agreement "contain[ed] the entire agreement between the parties and supersed[ed] any previous understandings, commitments or agreements, oral or written."  Finally, with regard to the availability of the Schafer digitizer, Exhibit A to the Agreement provided as follows:

> [C]ompliant with the requirements specified in the RFP [, the Schafer digitizer] will be available for delivery on August 31, 1991.  By July 31, 1991, [Cordant] shall make a determination, through consultations with [Ogden's] representative, on the probability of product availability by contract award.  If sufficient and satisfactory progress has not been made in order to make the product available by contract award, [Cordant] reserves the right, in its sole discretion, to pursue a replacement product . . . .  In the event that the [Schafer digitizer] is not available to [Cordant], it is agreed by the parties that it shall not be available to any other party participating in the Project.

Following its execution of the Teaming Agreement, Ogden submitted to Cordant initial pricing information, which covered both services and products, including digitizers.  Shortly thereafter, Ogden reduced its estimated price for software development services.

On August 9, 1991, Cordant submitted a bid to the Air Force

for the ARMS project.  Cordant's own evidence established that, at the time its bid was submitted, it knew that the Schafer digitizer was not yet fully developed or commercially available.  In December 1991, Cordant submitted to the Air Force its "best and final" offer (BAFO), listing Lenzar, a recently-acquired wholly-owned subsidiary of Schafer to which Schafer had delegated its obligation to provide the digitizers, as the supplier of the digitizers.  Again, at the time it submitted its "best and final" bid, Cordant knew that the Schafer digitizer was still in development and not in production, that there was "a risk that one will not be available," and that it was not "commercially available."

On January 9, 1992, the Air Force awarded Cordant the ARMS contract for the amounts set forth in Cordant's BAFO. Thereafter, Lenzar insisted on Cordant's negotiating a written subcontract with it.  By April 1992, however, there remained "unresolved contracting issues," and Cordant had not yet provided Lenzar with a draft subcontract.  Nevertheless, on April 17, 1992, Cordant requested that Lenzar provide it with "adequate written assurances" that Lenzar would perform its "obligation to deliver [the digitizers] as committed under the teaming agreement."  In response, Lenzar reiterated its request for negotiation of a written subcontract.  Cordant, thereupon, declared that Lenzar's response "constitute[d] an anticipatory repudiation of [the] Agreement," and, on June 2, 1992, Cordant

sent Lenzar a "termination" letter.  Thereafter, Cordant secured from another company a product to replace the Schafer digitizer.

III

Schafer contends that the Teaming Agreement is not an enforceable contract for the sale of digitizers.  It is, Schafer asserts, merely an agreement to agree in the future and, therefore, too vague and indefinite to be enforced.  Cordant responds that the Teaming Agreement "reveals a document that clearly sets forth in significant detail the obligations of the parties."

The Teaming Agreement is clear and unambiguous; indeed, neither party contends otherwise.  When a written agreement is clear and unambiguous, it is the duty of a court, not a jury, to determine whether an enforceable contract exists.  Pierce v. Plogger, 223 Va. 116, 120, 286 S.E.2d 207, 210 (1982).  Therefore, whether the Teaming Agreement contains the requisites of an enforceable contract is a matter of law.

In Allen v. Aetna Casualty & Surety, 222 Va. 361, 281 S.E.2d 818 (1981), an insurance company "did bargain for and obtain plaintiff's agreement not to retain counsel to prosecute his claim in exchange for [the company's] promise to effect full and final settlement with him."  Id. at 362, 281 S.E.2d at 819.  The insurance company subsequently breached this agreement with the plaintiff.  Id.  We noted that the crucial question in Allen was "whether the terms of the agreement . . . were too vague and

indefinite to enforce."  Id. at 363, 281 S.E.2d at 819.  In holding that the agreement was not an enforceable contract, we said

> there must be mutual assent of the contracting parties to terms reasonably certain under the circumstances in order to have an enforceable contract.  Here, there was no such mutual commitment.  No sum was specified in the agreement, nor was any method or formula alleged for determining the amount payable in settlement.  A court should not determine the terms of the settlement upon which the parties might ultimately agree.  As the agreement provided no reasonable basis for affording a remedy for its breach, it is too vague and indefinite to be enforced.

Id. at 364, 281 S.E.2d at 820.

In the present case, the Teaming Agreement provided that "[f]or all items identified in Exhibit A, [Ogden] shall supply pricing."  However, no price for the digitizers was set forth in the Agreement, and the Agreement shows that the parties knew that the digitizers might not be available for use if the ARMS contract were awarded to Cordant.  In that regard, the Agreement states that, by July 31, 1991, Cordant "shall make a determination, through consultations with [Ogden's] representative, on the probability of [the digitizer's] availability by contract award" and that, "[i]f sufficient and satisfactory progress has not been made in order to make the [digitizer] available by contract award, [Cordant] reserves the right, in its sole discretion, to pursue a replacement product."  Clearly, therefore, the Teaming Agreement shows by its express terms that it was not an enforceable contract for the sale of

digitizers. There was no mutual commitment by the parties, no obligation on the part of Ogden to sell the digitizers or on the part of Cordant to purchase them, no agreed purchase price for the product, and, indeed, no assurance that the product would be available when needed. It follows, therefore, that, if the Teaming Agreement was not enforceable against Ogden as a contract for the sale of goods, it also was not enforceable against Schafer under the claim that Schafer was Ogden's delegate within the meaning of the Uniform Commercial Code, i.e., Code § 8.2-210(1).

IV

Next, we consider Lenzar's appeal. The jury found that Lenzar was not liable to Cordant on its breach of contract claim. However, the jury found against Lenzar on Cordant's claim of promissory estoppel.

Lenzar contends on appeal, as it did at trial, that promissory estoppel is not a cognizable cause of action in Virginia. Cordant, citing Georgeton v. Reynolds, 161 Va. 164, 170 S.E. 741 (1933), claims we previously adopted promissory estoppel as a cause of action. We do not agree. In Georgeton, promissory estoppel was not asserted offensively as an affirmative claim, but was applied defensively to establish consideration for a unilateral contract (a release). Id. at 173-74, 170 S.E. at 744.

In the alternative, Cordant asks us to create a new cause of

action for promissory estoppel, adopting the approach set forth in Restatement (Second) of Contracts § 90(1) (1981).  The Restatement provides that "[a] promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee . . . and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise."

Although we have addressed the doctrine of promissory estoppel and even assumed, without deciding, the existence of such a cause of action, we never have held that such a cause of action exists or should be created.  See, e.g., Tuomala v. Regent University, 252 Va. 368, 376, 477 S.E.2d 501, 506 (1996) (noting that this Court "[has] not applied the doctrine in this Commonwealth"); Stone Printing and Mfg. Co. v. Dogan, 234 Va. 163, 165-67, 360 S.E.2d 210, 211-12 (1987) (assumed, without deciding, doctrine of promissory estoppel applies; held, however, elements not proved).  Today, however, we hold that promissory estoppel is not a cognizable cause of action in the Commonwealth, and we decline to create such a cause of action.  See Virginia School of the Arts v. Eichelbaum, 254 Va. ___, ___, ___ S.E.2d ___, ___ (1997) (this day decided); Ward's Equipment v. New Holland North America, 254 Va. ___, ___, ___ S.E.2d ___, ___ (1997) (this day decided).

V

In sum, we hold that no enforceable contract for the sale of

digitizers by Schafer to Cordant existed, and, with respect to Lenzar, promissory estoppel is not a cognizable cause of action.

Accordingly, the judgment of the trial court will be reversed in each appeal and final judgment will be entered in favor of Schafer and of Lenzar.

Record No. 961945 -- <u>Reversed and final judgment</u>.
Record No. 961964 -- <u>Reversed and final judgment</u>.