Present: Hassell, C.J., Keenan, Koontz, Kinser, Goodwyn, and
Millette, JJ., and Russell, S.J.

VIRGIL MONGOLD, CO-EXECUTOR AND
BENEFICIARY OF THE ESTATE OF
NINA M. DOVE, DECEASED, ET AL.          OPINION BY
                                  SENIOR JUSTICE CHARLES S. RUSSELL
v.  Record No. 081827                      June 4, 2009

TERRY V. WOODS

              FROM THE CIRCUIT COURT OF ROCKINGHAM COUNTY
                  George F. Tidey, Judge Designate

     This appeal presents questions concerning the interplay

between theories of recovery based on promissory estoppel and

quantum meruit.  It also involves the determination of quantum

meruit damages.

                       Facts and Proceedings

     In accordance with familiar principles of appellate

review, the facts will be stated in the light most favorable

to the party prevailing in the trial court.  Paul and Nina

Dove, husband and wife, purchased a tract of land in

Rockingham County as tenants by the entireties in 1985.  They

moved into a home on part of the property and conducted a

chicken-raising business on another part, as well as raising

sheep and cattle and growing a hay crop.  Terry V. Woods had

worked as a farm laborer for Paul Dove since Terry's

childhood, helping each summer with the hay crop on other land

owned by the Doves.

In 1985, Woods was 21 years old and was employed in the chicken-raising operations of the Rockingham Poultry Cooperative.  He had left school in the tenth grade.  Paul Dove was employed elsewhere, but wanted to continue the chicken-raising operation already located on the farm he had acquired.  He asked Woods to work for him, tending the chickens, mowing around the chicken houses, making some hay, and tending to the livestock.  Paul Dove intended to continue with his employment until he qualified for full retirement, after which he would return and share with Woods the responsibilities of the chicken-raising operation.

The Doves paid Woods a salary of $7,850 in 1985.  It was contemplated by the parties at the inception of the relationship that Woods' duties would occupy 35 to 40 hours per week, with every other weekend off.  In subsequent years, Woods received an annual raise, plus a cash bonus based on the year's profit from the chicken-raising operation.

About six months after Woods began to work for the Doves on a salary in 1985, during the hay-making season it became apparent that Woods' duties would consume far more that 40 hours per week.  He began to work every weekend.  He worked 11 hours a day, six days per week during the spring lambing season and 13 or 14 hours a day during the hay-making season. He had to work all night during the times when chickens were

2

being sold.  He also worked six to eight hours on Sundays during these peak seasons.

The Doves had no children.  They were very fond of Woods and, according to neighbors, treated him nearly like a son. At the time in 1985 when Woods' duties nearly doubled, the Doves could not afford to increase his salary to compensate him fully for his work.  Paul Dove, however, told Woods that he and his wife, having no children, would, if he "stayed and stuck with them . . . take care of [him]."  Woods and his wife lived on an adjoining farm.  Paul Dove had told him at the beginning: "75,000 chickens ought to be able to provide two families with a good, comfortable living."

Woods' employment by the Doves continued for the next 21 years.  About halfway through that relationship, Paul Dove became more specific as to his intentions, telling Woods that when he retired from raising chickens, he would turn the chicken houses over to Woods so that Woods could continue the operation and earn his living from them.  Paul Dove also told Woods that the Doves would leave the entire farm property to him when they died.  Woods, in reliance on that assurance, considered it his responsibility to perform extra work for the Doves, beyond that compensated by his salary, during their lifetimes.  Woods, without further compensation, tended the sheep and cattle, sheared sheep, did gardening and landscaping

3

work around the Doves' home, removed a wall in their house to enlarge a bedroom, cleaned the exterior of the house, built sheds, repaired fencing around the farm, and helped Paul Dove entirely fence a 180-acre tract of mountain land the Doves also owned.

Notwithstanding this additional workload, Woods' salary, after annual raises, had only increased to $8.96 per hour for a 40-hour week by 2004.[1] Woods testified that when Paul Dove discussed annual raises with him, he told Paul that he was making a living, and in view of his expectancy of inheriting the farm, "that's all that I was concerned about."

On March 11, 2005, Paul Dove died by accidental electrocution while working on a thermostat in one of the chicken houses. Woods was working elsewhere on the farm at the time. Paul died intestate and all the Dove property passed to his wife, Nina.

Nina Dove had suffered a stroke before her husband's death and, although in poor health, outlived him by two years. After Paul Dove's death, Woods continued to work for Nina, taking on the work Paul Dove had formerly done in addition to

---

[1] In 2004, the Doves paid Woods $12,508, representing $8.96 per hour for 50 weeks at 40 hours per week. It was assumed that Woods would be off work for two weeks during the hunting season each year. The 2004 salary was the highest Woods had ever received.

4

his usual duties.  Nina told him that she did not want the expense and aggravation, or the income, from the chicken-raising operation and that Woods should take it over.  He paid for the electricity for her home and the propane to heat it.  Nina was unable to walk, and Woods and his wife stayed with her night and day for about two weeks until her brothers and sisters made arrangements for her care.  Nina told him that she had made a will leaving him everything except the mountain land.[2]

Nina had a second stroke in late 2005 and went into a nursing home for rehabilitation.  She returned home thereafter and her family members stayed with her, or employed others to care for her, until she died as a result of a third stroke in April 2007.  On March 7, 2006, while Nina was in the care of her family members, Woods received a letter from Lorene Biller, Nina's sister, writing as Nina's attorney in fact, terminating his "use of the poultry houses."  After Nina's death, her last will, dated January 12, 2006, was admitted to probate.  It divided her entire estate among her brothers and sisters, with a bequest to her church.  Woods was not mentioned in the will.  Virgil Mongold and Donald E. Showalter (the Executors) qualified as co-executors under the will.

---

[2] A draft of such a will was introduced in evidence.  It was undated and never executed.

5

Woods brought this action against the Executors and beneficiaries. His complaint contains two counts; the first count seeks to impose a constructive trust upon the estate based on a theory of unjust enrichment; the second seeks damages based on a theory of quantum meruit. Woods made no challenge to the validity of the will.

After hearing the evidence ore tenus, the circuit court, in a letter opinion, ruled that Woods' evidence "does not rise to the level of clear and convincing evidence necessary to create a constructive trust on the property." The court observed that Paul Dove had clearly intended to leave the property to Woods and had told Woods and other witnesses of his intention. The court found, however, that the property was not Paul's to give, being held by husband and wife as tenants by the entireties, and Nina's intentions were not sufficiently clear. Accordingly, the court denied relief on Woods' first count and declined to impose a constructive trust. Woods does not appeal that ruling.

Nevertheless, the circuit court found by a preponderance of the evidence that Woods had established a valid claim for quantum meruit damages beginning in 1996 and continuing through 2004, including the value of the electricity and propane Woods furnished to the Dove home after Paul's death. The court entered a final order awarding Woods a judgment in

6

the amount of $115,172.57.  We awarded the Executors an appeal.  We also awarded an appeal to Woods on his assignment of cross-error to the circuit court's ruling that his right to quantum meruit damages did not accrue until 1996.

### Analysis

The Executors present three assignments of error:  (1) Woods' claims are based on promissory estoppel, for which there is no cause of action in Virginia; (2) quantum meruit damages are not recoverable where, as here, there is an express contract of employment; and (3) Woods presented no evidence of the reasonable value of the services he rendered.

### A.  Promissory Estoppel and Quantum Meruit

Where it is available, the cause of action based on promissory estoppel consists of four elements, recently defined as:  "(1) a promise, (2) which the promisor should reasonably expect to cause action by the promisee, (3) which does cause such action, and (4) which should be enforced to prevent injustice to the promisee."  Barnhill v. Veneman, 524 F.3d 458, 475-76 (4th Cir. 2008).  The Executors are correct in asserting that promissory estoppel is not a cognizable cause of action in Virginia.  In a trio of cases decided on the same day in 1997, we observed that such a cause of action had never been held to exist in the Commonwealth and we expressly declined to create such a cause of action.  W. J.

7

Schafer Associates v. Cordant, Inc., 254 Va. 514, 521, 493

S.E.2d 512, 516 (1997).  See Virginia School of the Arts v.

Eichelbaum, 254 Va. 373, 377, 493 S.E.2d 510, 512 (1997);

Ward's Equipment, Inc. v. New Holland North America, Inc., 254

Va. 379, 385, 493 S.E.2d 516, 520 (1997).  We have not altered

that position.

Promissory estoppel and quantum meruit are conceptually

distinct.  They require entirely different proof and result in

entirely different remedies.

Where promissory estoppel is available, the promisee must

prove, by the standard of evidence required in the

jurisdiction, the four elements quoted above from Barnhill.

If successful, the promisee is entitled to judicial

enforcement of the promisor's promise.  If that remedy were to

be applied to the present case, it would have required a

conveyance of all the Dove property, less the mountain land,

to Woods, if he had carried his burden of proof by clear and

convincing evidence.

Quantum meruit recovery, by contrast, is based upon an

implied contract to pay the reasonable value of services

rendered.  Hendrickson v. Meredith, 161 Va. 193, 198, 170 S.E.

602, 604 (1933).  See also Marine Development Corp. v. Rodak,

225 Va. 137, 140-41, 300 S.E.2d 763, 765 (1983).  This cause

of action has been available in Virginia for many years.  In

8

_Rea v. Trotter_, 67 Va. (26 Gratt.) 585, 592 (1875), this Court referred to it as "an undeniable principle of law." There, we said, "Where service is performed by one, at the instance and request of another, and . . . nothing is said between the parties as to compensation for such service, the law implies a contract, that the party who performs the service shall be paid a reasonable compensation therefor." (_Id._) The remedy available to the plaintiff is an award of damages amounting to the reasonable value of the work performed, less the compensation actually received for that work. _Hendrickson_, 161 Va. at 201, 170 S.E. at 605.

A party may state in a pleading as many claims as he has, "regardless of consistency and whether based on legal or equitable grounds." Rule 1:4(k). The fact that Woods' first count alleged facts that might have framed a cause of action for promissory estoppel, if such had been available, is immaterial to the claim made in his second count for damages based on quantum meruit. Therefore, we find no merit in the Executors' first assignment of error.

B. Quantum Meruit and Express Contract

The Executors point out that for a court to award a quantum meruit recovery, the court must conclude that there is no enforceable express contract between the parties covering the same subject matter. In such a case, the court will imply

9

a contract between the parties to prevent inequity; when such an express contract exists, however, there is no need to imply one because the parties have already negotiated an agreement. Nedrich v. Jones, 245 Va. 465, 477, 429 S.E.2d 201, 207 (1993). The Executors correctly state the rule, but the rule, according to its terms, applies only when there is an express, enforceable contract between the parties covering the services for which quantum meruit recovery is claimed. Id.; Royer v. Board of Supervisors, 176 Va. 268, 280, 10 S.E.2d 876, 881 (1940).

Implicit in the circuit court's holding is the finding that Woods and Paul Dove had an unwritten agreement, beginning in 1985, that Woods would work between 35 and 40 hours per week for the Doves. In return for that labor, he was to be paid a salary as agreed between them annually, plus bonuses from the sales of chickens. That contract was fully performed and Woods makes no claim for its breach. Also implicit in the court's holding is that when the first haying season began after the relationship was created, Woods' workload nearly doubled, and remained far in excess of 40 hours per week until the end of the relationship. There was, in 1985, no express contract covering Woods' compensation for the additional work except for the vague promise that the Doves, being unable to fully compensate him, would "take care of [him]." Later, Paul

Dove made a more specific promise as described above, but that promise was held by the circuit court not to constitute an enforceable contract. That holding was not appealed and is therefore the law of the case. Thus, the rule cited by the Executors has no application to Woods' additional, uncompensated work.

We will defer to the circuit court's determination of the facts unless unsupported by evidence or plainly wrong because an appellate court lacks the fact-finder's ability to hear and see the witnesses and assess their credibility. Patterson v. Patterson, 257 Va. 558, 564, 515 S.E.2d 113, 116 (1999). The record contains ample evidence to support the circuit court's conclusion that no express, enforceable agreement existed between the parties as to Woods' compensation for his work in excess of 40 hours per week. We cannot say that the circuit court's conclusion from the evidence, that an implied contract was necessary to prevent injustice to Woods, was plainly wrong.

### C. Damages

The Executors' final assignment of error is that Woods presented no evidence of the reasonable value of the services he rendered, an essential requisite of quantum meruit damages. See Virginia Fin. Assocs. v. ITT Hartford Group, 266 Va. 177, 183, 585 S.E.2d 789, 792 (2003); Marine Development, 225 Va.

11

at 140-41, 300 S.E.2d at 765-66; Hendrickson, 161 Va. at 200, 170 S.E. at 605. Woods presented evidence of the approximate number of hours he worked each year from 1985 until the relationship ended in 2006. The circuit court accepted that number as a fact in awarding damages.

The hourly rate the court applied to Woods' additional, uncompensated work was the same as the parties agreed on each year as compensation for the 40 hours per week for which they had contracted. Woods asked for no wage rate higher than the parties had agreed upon each year as reasonable compensation for the 40 hours covered by their express contract. The circuit court could properly conclude from the evidence that the parties, being in a position to know the prevailing wage rates for farm labor in the vicinity and the work Woods was to perform, had agreed upon the reasonable value of Woods' services for the originally-contemplated 40 hours per week. There was no evidence to suggest that the same rate was unreasonably high for his additional, uncompensated work.[3] We conclude that Woods presented sufficient evidence of the reasonable value of his services.

---

[3] Instead, testimony suggested that the rate was lower than the value of Woods' work because Paul Dove could not afford to pay him a higher rate but intended to leave the property to him. Woods did not ask that a higher rate be used in the assessment of damages. Accordingly, the question whether the rate was too low is not before us on appeal.

## D. Cross-Error

Woods contends that his uncompensated work, in excess of the 40 hours per week covered by his salary, began in 1985, when the haying season began some six months after the inception of his salaried employment with the Doves. The circuit court must necessarily have accepted that as a fact because there was no evidence of any substantial change in his workload thereafter until the end of the relationship, except for additional services he rendered to Nina Dove after Paul's death. Woods argues that the circuit court erred in ruling that his entitlement to quantum meruit damages did not begin until 1996.

Based on our review of the record, we agree with Woods. The circuit court stated in its opinion: "The evidence from [Woods] is that the relationship began in the middle of his employment. I will award [Woods] a judgment against the estate in the amount of $106,444.00 (1996-2004) plus the electric bills of $4,200.00 and the propane bills of $4,528.57." That finding was based upon Woods' testimony that it was "about midways through" his relationship with the Doves that Paul Dove told him that the Doves intended to leave the entire farm property to him when they died. The year 1996 was pertinent to Woods' claim for a constructive trust on the farm property, but that claim was unsuccessful and is not before us

13

in this appeal.  The year 1996 is irrelevant to Woods' claim for quantum meruit damages.

The unrefuted evidence is that the relationship between Woods and the Doves began in 1985 with the agreement that he would work 40 hours per week, that about six months later Woods' workload nearly doubled and remained at that level until 2006, and that he received no additional compensation for his services beyond 40 hours per week.  We conclude that the circuit court's determination that his entitlement to quantum meruit damages began only in 1996 was unsupported by the evidence.

Conclusion

Because we find no merit in the Executors' assignments of error, we will affirm the judgment of the circuit court with respect to the questions presented by their appeal.  Because we find error in the circuit court's judgment with respect to its award of damages, we will reverse the judgment in part and remand the case to the circuit court for further proceedings consistent with this opinion, limited to the issue of damages.

Affirmed in part,<br>reversed in part,<br>and remanded.