**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 17-1859**

JTH TAX, INC., d/b/a Liberty Tax Service; SIEMPRETAX+ LLC,

Plaintiffs - Appellants,

v.

GREGORY AIME; WOLF VENTURES, INC., d/b/a Wolf Enterprises; AIME CONSULTING, LLC; AIME CONSULTING, INC.,

Defendants - Appellees.

**No. 17-1905**

JTH TAX, INC., d/b/a Liberty Tax Service; SIEMPRETAX+ LLC,

Plaintiffs - Appellees,

v.

GREGORY AIME; WOLF VENTURES, INC., d/b/a Wolf Enterprises,

Defendants - Appellants,

and

AIME CONSULTING, LLC; AIME CONSULTING, INC.,

Defendants.

Appeal from the United States District Court for the Eastern District of Virginia, at Norfolk. Henry Coke Morgan, Jr., Senior District Judge. (2:16-cv-00279-HCM-DEM)

Argued: May 10, 2018                                    Decided: August 8, 2018

Before TRAXLER and DIAZ, Circuit Judges, and Richard M. GERGEL, United States District Judge for the District of South Carolina, sitting by designation.

Affirmed in part, vacated in part, and remanded with instructions by unpublished opinion. Judge Diaz wrote the majority opinion, in which Judge Traxler joined in full and Judge Gergel joined in part. Judge Gergel wrote a separate opinion dissenting in part.

**ARGUED:** Allison Jones Rushing, WILLIAMS & CONNOLLY LLP, Washington, D.C., for Appellants/Cross-Appellees. William Ryan Snow, CRENSHAW, WARE & MARTIN, P.L.C., Norfolk, Virginia, for Appellees/Cross-Appellants. **ON BRIEF:** Bradley D. Masters, WILLIAMS & CONNOLLY LLP, Washington, D.C., for Appellants/Cross-Appellees. David C. Hartnett, CRENSHAW, WARE & MARTIN, P.L.C., Norfolk, Virginia, for Appellees/Cross-Appellants.

Unpublished opinions are not binding precedent in this circuit.

DIAZ, Circuit Judge:

Gregory Aime operated nine tax preparation businesses in the New York area under franchise agreements with JTH Tax, Inc. and SiempreTax+ LLC (collectively, "Liberty Tax"). But when the IRS suspended Aime's electronic filing number, he could no longer prepare tax returns for his customers. So Aime and Liberty Tax entered into a contract by which Liberty Tax would purchase and assume control over Aime's businesses. The contract also provided Aime the option to buy back his businesses if he could get a new filing number from the IRS by a certain date. As the buyback deadline approached, Aime's chances of securing a new number on time looked bleak, and so Liberty Tax offered to extend the deadline of the buyback option until the end of the year. Soon after, the relationship between Aime and Liberty Tax went south. The parties sued one another in federal court, each claiming the other had breached their agreement.

After a bench trial, the district court awarded over two million dollars to Aime. The damages included reimbursement for certain expenses Liberty Tax owed under the contract and profits Aime lost because he was unable to repurchase his franchises. Critical to the judgment was the district court's holding that Aime could enforce Liberty Tax's promise to extend the buyback deadline. Both parties appealed: Liberty Tax asks for vacatur of the judgment and Aime seeks judgment on his fraud claim and attorney's fees.

We discern no error in the district court's decision to reject Aime's fraud claim and request for attorney's fees. Nor do we do disturb the district court's determination that Liberty Tax is liable for breach of contract. But we conclude the court erred when it

3

determined that Aime was entitled to lost profits based on the purported extension of the buyback deadline. Under relevant contract principles, the modification of the deadline needed to be supported by independent consideration in order to be enforceable. No such consideration was present here. Without that foundational block, the agreement to modify cannot stand. We therefore affirm in part, vacate in part, and remand to the district court with instructions to enter a new judgment consistent with this opinion.

I.

Liberty Tax offers tax preparation and filing services to customers through franchise locations around the country. Gregory Aime (individually and through several business entities) operated nine franchise businesses in the New York City area pursuant to agreements with Liberty Tax. Among other things, the franchise agreements required Aime to maintain an Electronic Filing Identification Number (an "EFIN") from the IRS. An EFIN authorizes a commercial tax preparer to file his customers' tax returns electronically, and is required by law.

In January 2016, the IRS revoked Aime's EFIN based on suspected fraudulent activity. The franchise agreements allowed Liberty Tax to terminate its relationship with Aime because of the revocation, but Liberty Tax chose not to do so. Instead, Aime and Liberty Tax entered into a new, superseding contract: a Purchase and Sale Agreement (the "PSA"). Under the PSA, Liberty Tax agreed to purchase Aime's franchise locations for a total of $1,107,580.36. Aime also promised to work with his landlords to assign leases for his franchise properties to Liberty Tax. In the meantime, Liberty Tax assumed

responsibility for all expenses and liabilities relating to Aime's franchises, including rent and utilities.

The PSA also included a buyback provision, which gave Aime the option to repurchase the franchises from Liberty Tax before May 8, 2016, if he received a new, valid EFIN by that time. A buyback of the franchises would occur "pursuant to a separate purchase and sale agreement between the parties" and subject to Liberty Tax's "standard sales and approval process." J.A. 704. If a buyback took place, Liberty Tax was to pay Aime "the Adjusted Net Profits . . . from the operation of the Business from the date of Closing through resale of the Business." *Id.*

In April 2016, John Hewitt, President and CEO of Liberty Tax, met with Marie Fletcher, a former employee of Aime's whom Liberty Tax had hired and assigned to oversee the Aime franchises. During the meeting, Fletcher and Hewitt discussed Aime's efforts to obtain a new EFIN. Fletcher told Hewitt that Aime would likely not be able to meet the May 8 deadline, but that she anticipated Aime would secure an EFIN later in the year. Hewitt told Fletcher that he would extend the buyback deadline in the PSA until December 31. At Hewitt's request, Fletcher later communicated the extension to Aime by phone.

Several weeks later, Aime sent an email to Hewitt, in which he expressed his understanding that Aime was "graciously allowing" him to extend the PSA until December. J.A. 816. Aime asked what steps he should take to "move forward" with the extension and asked to set up an in-person meeting with Hewitt. *Id.* About a week after that, Aime sent a second email to Hewitt asking to speak with him about the buyback.

5

Aime asked whether Liberty Tax would "like to switch leases over and handle a buyout" or if it would "extend [the PSA] and work things out with the buyback." J.A. 736. Hewitt did not respond to either email.

Meanwhile, Liberty Tax asked Aime to assign it the leases for his business properties, as the PSA required. The parties were unable to agree on the terms of the assignment and Aime eventually changed the entry code used to access some of his properties, effectively locking out Liberty Tax. The relationship between Aime and Liberty Tax continued to sour until Liberty Tax sued Aime in federal district court in Virginia.[1] Liberty Tax claimed that Aime breached the franchise agreements when the IRS suspended his EFIN, and that he breached the PSA by continuing to use Liberty Tax assets and failing to assign his leases. Aime countersued, contending that it was Liberty Tax that first breached the PSA by failing to pay or reimburse Aime for utilities and other obligations relating to the franchise properties. Aime also claimed that Liberty Tax committed fraud by offering a bogus extension on the buyback option while never really intending to let Aime repurchase the franchises. In September 2016, amid the litigation, Aime finally received a new EFIN.

The case proceeded to a bench trial, after which the district court issued its findings and conclusions. The court concluded that Liberty Tax breached the PSA first by failing to pay rent and expenses related to the Aime franchises. It also held that

---

[1] The parties consented through the PSA to personal jurisdiction in Virginia and also selected Virginia as the source of applicable substantive law.

Liberty Tax had extended the deadline for Aime to repurchase his franchises to December 31. Thus, Aime was entitled to reimbursement for the franchise-related expenses Liberty Tax had agreed to cover (less repayment for certain loans Liberty Tax had made to Aime). Liberty Tax also owed Aime lost profits for his franchises, based on the assumption that Aime, armed with a new EFIN, would have exercised his buyback option and repurchased the businesses by December 31. All told, the court awarded Aime $2,736,896.17 in damages. The court denied Aime's fraud counterclaim, finding that it was not sufficiently distinct from his breach of contract allegation, and denied his request for punitive damages and attorney's fees.

Both parties appealed. Liberty Tax claimed the district court erred in granting judgment in favor of Aime. Liberty Tax also contends the court erroneously excluded certain evidence at trial relating to its franchise sale and approval process. Aime asserts the district court erred by denying his fraud claim and denying him attorney's fees.

## II.

Much of this appeal turns on the answer to a single question: did Liberty Tax validly extend the buyback provision of the PSA from May 8 to December 31? If there was a valid extension, then Liberty Tax wrongfully deprived Aime of the opportunity to repurchase his franchises, and he's entitled to the profits he would have otherwise enjoyed. But if there was no extension, then Aime could not have bought back his businesses because he didn't obtain a new EFIN by the May 8 deadline.

7

Liberty Tax argues that the offer to extend the deadline didn't result in an enforceable contract because there was no consideration, Aime didn't accept the offer, and the agreement needed to be in writing to satisfy Virginia's statute of frauds. The district court found the extension valid and enforceable. We review the district court's conclusions of law de novo. *See Helton v. AT&T Inc.*, 709 F.3d 343, 350 (4th Cir. 2013). Because we find the issue of consideration dispositive, our discussion begins and ends there.[2]

Under Virginia law, the existence of a contract must be proven by showing there was "a complete agreement which requires acceptance of an offer, as well as valuable consideration." *Dean v. Morris*, 756 S.E.2d 430, 432–33 (Va. 2014) (internal quotation marks omitted). Just as any option requires valuable consideration to be binding in the first instance, *see Johnson v. Virginia-Carolina Lumber Co.*, 163 F. 249, 251 (4th Cir. 1908), an extension of an option also requires "some new and sufficient consideration" to support it. *Cummins v. Beavers*, 48 S.E. 891, 893 (Va. 1904).

"Virginia has long followed the 'peppercorn' theory of consideration," under which even the most picayune promise may be enough to make an agreement binding. *Sfreddo v. Sfreddo*, 720 S.E.2d 145, 153 (Va. Ct. App. 2012). Consideration can take the form of a benefit bestowed or a detriment endured. *Brewer v. First Nat'l Bank of Danville*, 120 S.E.2d 273, 279 (Va. 1961). Even a "slight advantage" or a "trifling

___

[2] Liberty Tax argued to the district court that the extension lacked consideration, but the district court didn't directly address the issue in its findings and conclusions. Because the argument was raised below, it's ripe for our de novo review.

inconvenience" can suffice. *R.K. Chevrolet, Inc. v. Hayden*, 480 S.E.2d 477, 480 (Va. 1997). Whatever the form, consideration is "the price bargained for and paid for a promise." *Brewer*, 120 S.E.2d at 279.

That bargained-for price is wholly absent here. The consideration on the part of Liberty Tax is simple enough: Hewitt promised to extend the buyback deadline until December 31. But a corresponding promise on Aime's behalf is nowhere to be found. The PSA imposed upon Aime a series of obligations, including selling his franchises to Liberty Tax; indemnifying Liberty Tax from franchise-related liabilities arising prior to the sale; and transferring office leases to Liberty Tax at its request. Those obligations had nothing to do with the later extension of the buyback deadline: the PSA obligated Aime to perform those promises, and so his duty to perform existed with or without the revised deadline. *See Seward v. New York Life Ins. Co.*, 152 S.E. 346, 350 (Va. 1930) ("The general rule is that a new promise, without other consideration than the performance of an existing contract in accordance with its terms, is a naked promise without legal consideration therefor and unenforceable."). And the fact that the repurchase offer was simply an option means that Aime could have declined to buy back his franchises and Liberty Tax would have no recourse at all. [3]

---

[3] Had Liberty Tax offered to sell Aime back his franchises on December 31, and Aime agreed to purchase them on that date, there likely would have been reciprocal promises sufficient to bind one another. *See Major v. Price*, 84 S.E.2d 445, 448 (Va. 1954). But "an option given without a consideration . . . is simply an offer to sell, and can be withdrawn at any time before acceptance." *Cummins*, 48 S.E. at 893.

Aime points to three possible forms of consideration. First, Aime argues that he paid for certain expenses and utilities relating to the franchises and a call center when the obligation to pay was Liberty Tax's and not his. Second, Aime says, he continued to pay rent for the franchises beyond the May 8 deadline contained in the PSA. Finally, Aime contends that he made additional efforts to secure a new EFIN, and that had there not been an extension offered by Liberty Tax, Aime would have had no reason to invest his time and money pursuing his application.

Liberty Tax cavils a bit with these assertions. But even assuming they're all true, and that Aime had no independent obligation to perform them, none of these acts can serve as consideration for the simple reason that there's no evidence in the record that they were bargained for. Hewitt didn't ask Aime—directly, or even through Fletcher—to perform any of those tasks in exchange for the deadline extension, nor did Aime offer to do so.

Aime claims that it was obvious and foreseeable that he would undertake those actions in light of the deadline extension—and he's right. Certainly an extension of the deadline would induce Aime to continue his work to obtain a new EFIN so that he could reacquire his franchises. Certainly Liberty Tax knew that. But even so, foreseeable inducement does not constitute consideration. Instead, that argument sounds in another contract-related theory: the doctrine of promissory estoppel.

Promissory estoppel consists of "(1) a promise, (2) which the promisor should reasonably expect to cause action by the promisee, (3) which does cause such action, and (4) which should be enforced to prevent injustice to the promisee." *Mongold v. Woods*,

10

677 S.E.2d 288, 292 (Va. 2009) (internal quotation marks omitted); *see also* Restatement (Second) of Contracts § 90(1) (1981). Aime didn't argue promissory estoppel here, and for good reason: Virginia doesn't recognize the claim. *See Mongold*, 677 S.E.2d at 292 ("[P]romissory estoppel is not a cognizable cause of action in Virginia."); *see also W.J. Schafer Assocs. v. Cordant, Inc.*, 493 S.E.2d 512, 515–16 (Va. 1997) (recognizing same and explicitly "declin[ing] to create such a cause of action"). Thus, we can't enforce Liberty Tax's promise based solely on Aime's reliance upon it, no matter how reasonable or foreseeable that reliance may have been.

Our dissenting colleague suggests that we "presume[] that the Virginia Supreme Court's rejection of the doctrine of promissory estoppel implicitly overrules" a series of cases that purportedly recognize "that where the formalities of a contract are present (offer and acceptance), consideration will be found to be present where a promise foreseeably induces the promisee to act to his detriment and to the benefit of the promisor." Dissent at 20. But we don't conclude that the cited cases are no longer good law; we simply read them differently. Though Virginia law may not be pellucid on this point, we view the parties' conduct in those cases as amounting to a reciprocal exchange of promises (even if attenuated)—which is what is lacking here.

For example, in *Looney v. Belcher*, 192 S.E. 891 (Va. 1937), the bank officers expressly promised Vandyke to "secur[e] and guarantee[] any loss which might accrue to him on account of" his deposits with the bank in exchange for his promise not to move his money elsewhere. *Id.* at 163; *see also id.* at 166 (guaranty made "in consideration of the said Fred Vandyke making these deposits with said bank"). And *Dulany Foods, Inc.*

11

*v. Ayers*, 260 S.E.2d 196 (Va. 1979) and *Twohy v. Harris*, 72 S.E.2d 329 (Va. 1952) are based on the well-recognized rule that in the context of at-will employment, an employee's continued work can serve as adequate consideration to make a change in the terms of her employment (or some other promise) enforceable. *See Dulany Foods*, 260 S.E.2d at 200–01 (noting it wasn't material "whether [the employees] continued to work because they relied upon the promise of severance pay" because "such a promise amounts to an offer, which, if accepted by performance of the service, fulfills the legal requirements"); *Twohy*, 72 S.E.2d at 336 (describing the case as one where one party "makes a promise conditioned upon the doing of an act by another"). All told, we see the cases cited by our dissenting colleague not as overruled, but simply incongruous to the facts before us.

The offer to extend the deadline lacks consideration, the cornerstone of contract. Without it, Hewitt's offer to extend the deadline was in effect a gratuitous promise, and one a court can't enforce. The district court erred in doing so, and therefore we must vacate the judgment below to the extent it relied on the validity of the deadline extension. Because the agreement to modify lacked the essential ingredient of consideration, we need not decide whether Aime validly accepted the offer, or whether the statute of frauds required that the agreement be reduced to a writing.[4]

---

[4] Liberty Tax also says that the district court abused its discretion in excluding certain evidence relating to its sales and approval process. In short, Liberty Tax argues that because the PSA appears to condition the buyback option on Liberty Tax's "standard sales and approval process," J.A. 704, Liberty Tax's promise to participate in the buyback was in effect illusory because it was completely subject to the whims and (Continued)

Aime contends the district court erred in refusing to grant judgment on his fraud claim. According to Aime, Liberty Tax fraudulently induced him to enter into the PSA while never intending to abide by its terms. Aime says Liberty Tax never planned to pay the franchise expenses, nor was it ever going to sell him back his franchises (EFIN or not). The district court, however, concluded that the allegations of that claim were not sufficiently distinct from Aime's claims for breach of contract and breach of the implied covenant of good faith and fair dealing. Thus, the court explained, the claim was barred by the independent tort doctrine.

Under Virginia law, fraud in the inducement occurs when a party to a contract makes "a false representation of a material fact, constituting an inducement to the contract, on which" the other party "had a right to rely." *George Robberecht Seafood, Inc. v. Maitland Bros. Co.*, 255 S.E.2d 682, 683 (Va. 1979) (internal quotation marks omitted). But the independent tort doctrine provides that "an action based upon fraud must aver the misrepresentation of present pre-existing facts, and cannot ordinarily be predicated on unfulfilled promises or statements as to future events," lest "every breach of contract . . . be made the basis of an action in tort for fraud." *Abi-Najm v. Concord Condominium, LLC*, 699 S.E.2d 483, 490 (Va. 2010) (quoting *Lloyd v. Smith*, 142 S.E. 363, 365 (Va. 1928)).

---

discretion of Liberty Tax. We need not resolve the issue given our conclusion that the deadline extension is unenforceable for want of consideration.

It's true that an "action in tort for deceit and fraud may sometimes be predicated on promises which are made with a present intention not to perform them," when the fraud is based not on "the breach of the agreement to perform, but the fraudulent intent." *Id.* (quoting *Boykin v. Hermitage Realty*, 360 S.E.2d 177, 178 (Va. 1987)). In such a case, fraud arises because the "state of the promisor's mind at the time he makes the promise is a fact" and if the promisor represents his state of mind "as being one thing when in fact his purpose is just the contrary, he misrepresents a then existing fact." *Id.* This isn't such a case.

The record here doesn't show a material misrepresentation made by Liberty Tax before entering into the PSA with Aime. Liberty Tax's mischief came later. As Aime points out, the district court did state that Liberty Tax "never had any intention of recognizing Mr. Aime's right to repurchase the business." J.A. 693. But taken as a whole, the court's findings and conclusions—supported by the record and consistent with its judgment—explain the court's belief that Liberty Tax, upon entering into the PSA, didn't take its obligations under the contract seriously. *See, e.g.*, J.A. 694 ("[T]hey simply looked upon the purchase and sale agreement as a piece of paper that they could do with as they please, which, in fact, is what they did."). Avoiding contractual responsibilities may be lamentable, but it does not a fraud claim make. We therefore affirm the district court's decision to reject Aime's claim of fraud.[5]

---

[5] And as the district court correctly noted, absent a viable fraud claim, Aime isn't entitled to attorney's fees.

## IV.

Finally, we briefly address the issue of remedy. Our decision doesn't affect the district court's conclusion that it was Liberty Tax that breached the PSA first by failing to pay or reimburse certain expenses related to the Aime franchises. Any damages flowing from that breach should remain, whether incurred before or after the May 8, 2016 buyback deadline. But as we've explained, the court erred in finding that Liberty Tax and Aime validly extended the PSA's buyback option, and so Aime wasn't entitled to damages resulting from Liberty Tax's refusal to sell back his former franchises. On remand, the district court should enter appropriate damages consistent with those principles.

*AFFIRMED IN PART, VACATED IN PART,*
*AND REMANDED WITH INSTRUCTIONS*

15

GERGEL, District Judge, concurring in part and dissenting in part:

I respectfully dissent. I find my disagreement with my able colleagues in the majority turns on a narrow, but defining issue: where parties have entered into an agreement in which there is an offer and acceptance, can the promisor's foreseeable inducement of the promisee to act to his detriment and to the promisor's benefit in reliance upon a promise constitute valuable consideration under Virginia law? After a careful review of Virginia case law, I conclude that such foreseeable induced reliance constitutes valuable consideration, making the agreement between the parties an enforceable contract.

## I.

The defendants below (hereafter referred to collectively as "Aime") operated nine separate franchise locations in the New York City area under a franchise agreement with plaintiffs (hereafter referred to collectively as "Liberty Tax"). In January 2016, the Internal Revenue Service revoked Aime's Electronic Filing Identification Number ("EFIN"), which was required for Aime to file tax returns on behalf of its clients. This created an imminent crisis for both franchisor and franchisee which threatened to bring about the collapse of a viable and valuable business enterprise. To maintain the ongoing operations of the franchises, Liberty Tax purchased the businesses under an Agreement of Purchase and Sale (the "Agreement"), with the proviso that Aime would have the option to buy back the businesses if Aime had the EFIN restored by May 8, 2016. The Agreement provided that Liberty Tax would be responsible for all expenses of the businesses after the Agreement was executed on January 21, 2016.

16

The Agreement created powerful incentives for Aime to do what it could to maintain the viability of the businesses while it pursued the reinstatement of the EFIN. Any net profit made during the period from the sale of the businesses to Liberty Tax until the buyback would be paid to Aime in the event it was able to repurchase the businesses. In the event Aime was unable to buy back the businesses, the purchase price to be paid by Liberty Tax to Aime would be reduced by any net losses suffered before the payoff date of May 15, 2016.

Aime, although not required under the Agreement to pay ongoing business expenses after January 21, 2016, continued to pay for rent, utilities, a call center, and a central processing center in the hope of maintaining the viability of the business operations while efforts were made to restore the EFIN. On April 8, 2016, a district manager for Liberty Tax, Marie Fletcher, met with the CEO of Liberty Tax, John Hewitt, concerning the status of Aime's efforts to have the EFIN restored. Fletcher testified at trial that she informed Hewitt that Aime would not be able to meet the May 8, 2018 deadline in the Agreement, but that the EFIN would likely be reinstated by October 2016. Hewitt then told Fletcher that he would extend the buyback provision of the Agreement until December 31, 2016, and authorized her to inform Aime of that decision. That same day she informed Gregory Aime, the principal in the businesses, of Hewitt's agreement to extend the deadline.

Aime then responded in a foreseeable way by continuing to support the ongoing expenses of the businesses after the May 8, 2016 deadline. Gregory Aime testified that had he not been promised the extension of the deadline by Liberty Tax until December

17

31, 2016, he would have immediately ceased financially supporting the businesses after May 8th.

The trial court, which tried the case without a jury, found the testimony of Fletcher "credible" and "unrebutted." The lower court noted that in pretrial motions, Liberty Tax denied the meeting between Fletcher and Hewitt had occurred and contended that Hewitt never promised to extend the buyback deadline. Hewitt did not appear at the trial, and the trial court found that Hewitt's course of conduct entitled Aime to a missing witness adverse inference. The trial court further found that Hewitt's conduct reflected the fact that he never intended to allow Aime to repurchase its businesses and was essentially stringing it on to keep the franchises operating. Additionally, Fletcher testified that Liberty Tax offered to cover her expenses in a different case if she would not show up to testify for Aime in this action. The trial court ultimately found that the offer by Liberty Tax to extend the deadline until December 31, 2016 was accepted by Aime and that the parties had an enforceable contract. The lower court awarded actual damages to Aime of $2,736,896.17, for damages arising from Liberty Tax's breach of contract.

## II.

The critical issue in this appeal turns on whether there was consideration to support the offer made by Liberty Tax on April 8, 2016 to extend the buyback deadline that was subsequently accepted by Aime. There is no question there must be new consideration to support the extension. The majority, while recognizing that Liberty Tax's promise to extend the buyback deadline would induce "obvious and foreseeable" actions by Aime, concludes that Aime's claim "sounds in . . . promissory estoppel,"

18

which the Virginia Supreme Court has clearly rejected as a freestanding equitable cause of action. *W.J. Schafer Associates, Inc. v. Cordant, Inc.*, 493 S.E.2d 512, 515–16 (Va. 1997).

While the majority is undoubtedly correct in recognizing the Virginia Supreme Court's firm rejection of the doctrine of promissory estoppel, there is a long line of Virginia cases extending over decades that recognizes that where an offer has been made and accepted, consideration may be found where the promisee was induced to act by the promise to his detriment and to the benefit of the promisor. *United Masonry Inc. of Va. v. Riggs Nat'l Bank*, 357 S.E.2d 509, 513–14 (Va. 1987) ("Sufficient consideration exists if the promisee is induced to . . . to do something that he is not legally bound to do or refrains from doing anything he has a legal right to do, or if the promisee acts in reliance upon the waiver to his detriment"); *Dulany Foods, Inc. v. Ayers*, 260 S.E.2d 196, 200–201 (Va. 1979) ("Ample authority sustains the view that such a promise [of an employer to pay severance pay to employees] amounts to an offer, which, if accepted by performance of the service, fulfills the legal requirements of a contract"); *Brewer v. First Nat'l Bank of Danville*, 120 S.E.2d 273, 279–80 (Va. 1961) (Where a party, "relying in part on the promise of the corporation to pay her the weekly salary for life, gave up her positions as president and director of the corporation" and sold her stock at a fraction of the value, the party had an enforceable contract for the payment of her weekly salary); *Twohy v. Harris*, 72 S.E.2d 329, 335–36 (Va. 1952) (Where an employer promised an employee stock if the employee stayed with the company, and the employee remained with the company and performed his services for seven years, "[i]t is well settled that a

contract made under such circumstances is supported by valuable consideration"); *Looney v. Belcher*, 192 S.E. 891, 893 (Va. 1937) (Where a bank customer refrained from withdrawing his funds upon a guaranty of the bank officers to protect him against any loss, "[t]here can be no question about the presence of a consideration sufficient to support the guaranty bond . . . ."); *Richmond Eng'g and Mfg. Corp. v. Loth*, 115 S.E. 774, 787 (Va. 1923) (A promise by the owner of a building to pay the subcontractors if they continued on the job after the contractor became insolvent "was adequate consideration to support the promise, 'though it has been but a peppercorn'").

The majority presumes that the Virginia Supreme Court's rejection of the doctrine of promissory estoppel implicitly overrules this line of cases addressing when induced reliance may constitute consideration under Virginia law. This, I believe, overreads the Virginia Supreme Court's ruling in *W.J. Schafer* and misapprehends the origins and principles that underlay the *United Masonry* line of cases. Virginia adheres to the "peppercorn" theory of consideration, in which even the most minimal thing of value constitutes sufficient consideration. *Sfreddo v. Sfreddo*, 720 S.E.2d 273, 279 (Va. Ct. App. 2012). Consistent with this broad interpretation of consideration, Virginia courts have long recognized that where the formalities of a contract are present (offer and acceptance), consideration will be found to be present where a promise foreseeably induces the promisee to act his detriment and to the benefit of the promisor. This legal principle, adopted in *United Masonry* and other Virginia cases going back nearly a century, sounds in the common law, not in equity.

Promissory estoppel, which Virginia clearly rejects, is an equitable cause of action that seeks to enforce a promise where not to do so would create an injustice. Under promissory estoppel, there is no requirement of offer and acceptance, simply a promise which foreseeably induces a person to act to his detriment. *Mongold v. Woods*, 677 S.E. 2d 288, 292 (Va. 2009). The recognition of this cause of action has been promoted in the First and Second Restatement of Contracts, Section 90(1). Some, including the Virginia Supreme Court, have viewed such a cause of action as conceptually unmoored and potentially creating an avalanche of litigation on the slimmest of evidence.

In rejecting the equitable cause of action of promissory estoppel in *W.J. Schafer*, the Virginia Supreme Court did not suggest in any way that it was intending to overrule the *United Masonry* line of cases. This Court has previously and wisely held that "[a] subsequent decision cannot, by mere implication, be held to overrule a prior case unless the principle is directly involved and the inference clear and impelling." *Kestler v. Board of Trustees of North Carolina Local Gov't Employees' Retirement System*, 48 F. 3d 800, 804 (4th Cir. 1995), quoting *Cole v. Cole*, 51 S.E. 2d 491, 494 (N.C. 1949).

The majority further asserts that the *United Masonry* line of cases is "simply incongruous to the facts before us." While each of these cases arises out of a set of circumstances not factually identical to the matters presented here, this body of case law consistently stands for the proposition that where parties have had a meeting of the minds on offer and acceptance, sufficient consideration will be found to be present where it is foreseeable that the promise will induce the promisee to act to his detriment and to the benefit of the promisor. The bargained for exchange is inferred to be present from the

21

foreseeable consequences of the promise since it is to be anticipated that the promise will induce the promisee to act, producing the required consideration to make the agreement an enforceable contract.

The trial court found that Liberty Tax offered to extend the buyback deadline in the Agreement from May 8, 2016 until December 31, 2016 and that Aime accepted that offer. The trial court further found that after May 8, Aime continued to pay for utilities and other services for the businesses, which Gregory Aime and Ms. Fletcher testified would not have been done but for the promise made by Liberty Tax. There is ample record evidence to support these findings. The majority recognizes that Liberty Tax's promise to extend the deadline for the buy back until December 31, 2016 induced "obvious and foreseeable" actions by Aime, including the continued payment of business expenses after May 8, 2016 that would have never occurred but for Liberty Tax's promise. I believe the *United Masonry* line of cases remains good law in Virginia and provides ample support to find the presence of valuable consideration under these facts, making the agreement an enforceable contract.[*] I would, consequently, affirm the lower court's finding that Aime had an enforceable contract to extend the buyback deadline.

---

[*] Although state trial court decisions are not controlling precedent, I find it instructive that the Loudoun County Circuit Court in *Cardinal Bank v. Britt Construction, Inc.*, held that while promissory estoppel is not recognized in Virginia, "detrimental reliance may serve as the basis for consideration in the case of a lien waiver." 68 Va. Cir. 520, 2004 WL 2877385, at *2 (Va. Cir Ct. 2004) (citing *United Masonry*, 357 S.E.2d at 513–14).

Liberty Tax further argues that even if the offer to extend the deadline for the buyback included acceptance and consideration, the agreement is unenforceable due to the Statute of Frauds. It is well settled under Virginia law that the Statute of Frauds applies "only if *both* parties to an oral contract are incapable of performing their contractual obligations within one year of the contract's formation." *Blue Sky Travel & Tours, LLC v. Al Tayyar*, 606 Fed. App'x 689, 694 (4th Cir. 2015) (emphasis in the original) (citing *Silverman v. Bernot*, 239 S.E.2d 118, 121 (Va. 1977)). Since the oral agreement, reached in April 2016 and modifying an agreement made in January 2016, simply extended the deadline to exercise the buyback option until December 31, 2016, the contract was fully performable within one year. I agree with the trial court that the Statute of Frauds does not bar enforcement of this agreement.

Further, Liberty Tax would be equitably estopped from asserting the Statute of Frauds under these circumstances. Virginia law recognizes that a party may be equitably estopped from asserting the Statute of Frauds where (1) a material fact was falsely represented or concealed; (2) the representation was made with the knowledge it was false; (3) the party receiving the representation was unaware it was false; (4) the representation was intended to be relied upon; (5) the other party was induced to act; and (6) the other party was misled to his injury. *Boykins Narrow Fabrics Corp. v. Weldon Roofing and Sheet Metal*, 266 S.E.2d 887, 890 (Va. 1980). The lower court's findings and the record before this Court fully support each of the elements of equitable estoppel, barring Liberty Tax from asserting this defense.

## IV.

I concur in the majority's affirmance of the lower court's decision denying judgment on the fraud claim and in awarding damages to Aime for Liberty Tax failing to reimburse Aime for expenses incurred after January 21, 2016, as mandated in the Agreement. I would affirm the decision of the lower court in all respects. Since that conclusion is not shared by my colleagues, I respectfully dissent.